# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| J & M SALES INC., et al., | ) Case No. 18-11801 (___) |
| | ) |
| Debtors.[1] | ) Joint Administration Requested |
| | ) |

### MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION CREDIT FROM CRITICAL VENDORS; (B) APPROVING CRITICAL VENDOR PROGRAM AND GRANTING OF JUNIOR LIENS TO CRITICAL VENDORS; (C) AUTHORIZING BANKS TO HONOR AND PROCESS RELATED CHECKS AND ELECTRONIC TRANSFERS; (D) SCHEDULING FINAL HEARING; AND (E) GRANTING RELATED RELIEF

By this Motion (this "**Motion**"), J & M Sales Inc. and its affiliated debtors in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), as debtors and debtors in possession ("**Debtors**"), request the entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively (the "**Proposed Orders**"):  (a) authorizing the Debtors to provide for payment terms of both prepetition and postpetition claims of certain Critical Vendors (as defined below) and to incur postpetition credit up to $40 million, on a final basis, from the Debtors' Critical Vendors through the delivery of postpetition goods to the Debtors pursuant to the terms of the Debtors' critical vendor program described below (the "**Critical Vendor Program**"); (b) approving the terms of the Critical Vendor Program as provided herein and granting the Critical Vendors the Critical Vendor Liens

---

[1]  The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: J & M Sales Inc. (4697); National Stores, Inc. (4874); J&M Sales of Texas, LLC (5979); FP Stores, Inc. (6795); Southern Island Stores, LLC (8099); Southern Island Retail Stores LLC (4237); Caribbean Island Stores, LLC (9301); Pazzo FNB Corp. (9870); Fallas Stores Holdings, Inc. (6052); and Pazzo Management LLC (1924). The Debtors' mailing address is 15001 South Figueroa Street, Gardena, CA 90248.

(defined below) on account of the entirety of their postpetition critical vendor claims and a portion of their prepetition critical vendor claims and which liens would be junior and subordinated (the "**Junior Liens**") to the liens of any debtor in possession lender, any adequate protection liens, the existing liens of the Debtors' prepetition senior secured lenders, and any carve out for professional fees provided under the DIP Order (defined below); (c) approving the form of Critical Vendor Agreement (as defined below), (d) authorizing financial institutions to honor and process related checks and transfers; (e) scheduling a final hearing on the Motion to approve the Critical Vendor Program; and (f) granting any additional relief as is necessary to effectuate the foregoing.  In support of this Motion, the Debtors submit the *Declaration of Curt Kroll in Support of Chapter 11 Petitions and First Day Motions* (the "**Kroll Declaration**") and the *Declaration of Marc Bilbao in Support of Debtors' Motions With Respect to DIP Financing, Critical Vendors and Store Closings* (the "**Bilbao Declaration**), and respectfully represent as follows:

### Preliminary Statement

The Debtors' Critical Vendors have agreed to something extraordinary in these cases:  they have agreed to provide goods on 120-day terms to enable the Debtors to operate their business and remain in chapter 11 in order to attempt to effectuate either a restructuring or going concern sale of their assets.

Obtaining the postpetition trade credit from the Debtors' critical vendors proposed by the Motion is a critical component of the Debtors' proposed debtor in possession financing

agreement with their lenders and is necessary for the Debtors to continue operations and pursue either a restructuring or sale transaction with respect to their business.

Typically in chapter 11 cases, vendors may agree to do business with debtors either pursuant restrictive cash-on-delivery terms or on extremely short and onerous trade terms. Here, the Debtors' Critical Vendors have agreed to extend credit to provide postpetition goods and to allow the Debtors four months to pay for goods delivered postpetition in order to allow the Debtors to have sufficient capital to operate and to administer their chapter 11 cases. Moreover, the Critical Vendors have agreed to do this even though only a portion of their prepetition claims will be paid pursuant to this Motion. The Debtors believe the ability to operate under chapter 11 and attempt to either restructure or effectuate a going concern sale of their assets is in the best interests of their creditors, and a far better alternative than immediately liquidating if the Debtors cannot obtain the necessary postpetition credit pursuant to this Motion. The Debtors' ability to continue to operate under chapter 11 is entirely premised on the funding provided under this Motion. Simply put, if the Debtors are unable to obtain the postpetition credit from their Critical Vendors pursuant to this Motion, the Debtors will not have sufficient funds to continue to operate their business. Therefore, it is critical for the Debtors and their economic constituents that the Motion be granted.

## Jurisdiction and Venue

1.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District

Court for the District of Delaware, dated February 29, 2012. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

3.     The statutory bases for the relief requested herein are sections 105(a), 361, 362, 363, 364, and 507(a) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 6003, 6004, and 9013 of the Federal Rules of Bankruptcy Procedures (the "**Bankruptcy Rules**") and Local Rules 4001-2 and 9013-1(f).

### Background

4.     On the date hereof (the "**Petition Date**"), each Debtor commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner, and no official committee(s) has been appointed in these cases.

5.     The Debtors are leading discount retailers offering brand-name clothing for men, women, boys, girls, juniors, infants, and toddlers along with lingerie, shoes, toys, and household items. The Debtors' business was started in 1962 in a single location in downtown

Los Angeles. The company has been family owned and operated for 56 years and now operates

340 stores in 22 states and Puerto Rico and employs over 9,800 people.

6.     The Debtors offer a broad selection of value-priced merchandise,

including apparel, bedding, household supplies, décor items, and other general merchandise. The

Debtors' stores support underserved, low-income communities and are typically located in

power-strip centers, specialty centers, and downtown areas.

7.     A more detailed description of the Debtors' business and operations, and

the events leading to the commencement of these Chapter 11 Cases is provided in the Kroll

Declaration and a description of the Critical Vendor Program is described in the Bilbao

Declaration, each of which are each incorporated herein by reference.

### Relief Requested

8.     By this Motion, the Debtors seek entry of interim and final orders

authorizing but not directing the Debtors, in their sole discretion and subject to and in accordance

with any orders authorizing postpetition financing and the use of cash collateral and the

applicable budget thereunder, to enter into agreements providing for certain payment terms to

certain designated vendors (the "**Critical Vendors**").  The Debtors also seek (a) authority to

obtain postpetition credit from the Critical Vendors of up to $15 million on an interim basis and

$40 million on a final basis; (b) approval of the Critical Vendor Program, including (i) with

respect to a Critical Vendor's postpetition claim, the granting of the Second Lien (defined below)

securing the full amount of the postpetition credit extended by the Critical Vendor to the

Debtors; and (ii) with respect to the Critical Vendor's prepetition claims, the granting of the

Third Lien (defined below) securing the lesser of (A) the full amount of postpetition credit advanced by the Critical Vendor or (B) 60% of the amount of the Critical Vendor's prepetition claim; (c) approving the form of the Critical Vendor Agreement; (d) authorizing financial institutions to honor and process checks or electronic transfers used by the Debtors to pay the foregoing, to the extent necessary; (e) scheduling a final hearing on the Motion; and (f) granting any additional relief as is necessary to effectuate the foregoing.

### Summary of Critical Vendor Program

9.     Set forth below is a general summary of the major terms of the Critical Vendor Program:

a.     <u>Amount and Availability</u>.  The Debtors seek authority obtain credit from the Critical Vendors on 120-day terms in accordance with customary prepetition business practices, as may be modified, that would be used to fund the Debtors' operations during these Chapter 11 Cases.  The Debtors seek postpetition credit funded by the Critical Vendors up to an aggregate amount to $15 million on an interim basis and $40 million on a final basis, which will be used for working capital and general corporate requirements under the Critical Vendor Program.

b.     <u>Security and Ranking</u>.  Critical Vendors will provide credit to the Debtors with at least 120-day terms.  Each Critical Vendor shall receive: (a) a secured, junior and subordinated second lien on the Debtors' assets (a "**Second Lien**") as security for the claim in the amount of the agreed-upon cost of goods advanced postpetition by such Critical Vendor to the Debtors (each, a "**Second Lien Claim**"), which lien is junior  and subordinated in priority of

payment on the goods provided by the Critical Vendor to (i) the senior secured claims of the

prepetition lenders as provided under (A) the *Credit Agreement* dated as of December 28, 2016

(as amended, supplemented, or modified from time to time, by and among certain of the Debtors,

as borrowers, Encina Business Credit, LLC, as administrative agent, collateral agent and lender

and Israel Discount Bank of New York, as co-administrative agent and lender, and the other

lenders party thereto, (B) the *Loan and Security Agreement* dated as of June 15, 2016, as

amended, supplemented or modified from time to time, by and among certain of the Debtors, as

borrowers, Gordon Brothers Finance Company, as administrative agent and lender, and the other

lenders party thereto; and (C) the claims of the Debtors' postpetition lenders (collectively, the

"**DIP Lenders**"), including any adequate protection liens or claims, provided under the *Interim*

*Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 And 507 (I) Granting Expedited Relief,*

*(II) Approving Postpetition Financing, (III) Granting Liens And Providing Superpriority*

*Administrative Expense Status, (IV) Authorizing Use Of Cash Collateral, (V) Granting Adequate*

*Protection, (VI) Modifying Automatic Stay, And (VII) Granting Related Relief,* as may be

modified pursuant to any final order (the "**DIP Order**"); the Prepetition Permitted Liens (as

defined in the DIP Order); (iii) the Carve Out (as defined in the DIP Order); and (iv) without

duplication, any amounts to Imperial Capital, LLC in accordance with and pursuant to the terms

of any order approving its employment entered by the Court in these Chapter 11 Cases

(collectively, the claims listed in (i) and (iv) of this paragraph, the "**Senior Secured Claims**");

and (b) a secured junior and subordinated third lien on the Debtors' assets (a "**Third Lien**")

securing the claim in the amount of a portion of the Critical Vendor's prepetition claim on

account to the goods already provided to the Debtors (each, a "**Third Lien Claim**"), which claim would be junior and subordinated in payment priority after payment of (i) the allowed Senior Secured Claims; and (ii) the allowed Second Lien Claims. The amount of Third Lien Claim shall equal to the *lower* of: (i) the full amount of new credit advanced postpetition by such Critical Vendor to the Debtors or (ii) 60% of the amount of such Critical Vendor's prepetition claim. The Second Lien Claims and Third Lien Claims are collectively referred to herein as the "**Critical Vendor Claims**"). The Second Lien and the Third Lien are collectively referred to herein as the "**Critical Vendor Liens.**"

   c. <u>Term and Repayment</u>. A subordinated loan and security agreement included in the agreement with the Critical Vendors and set forth substantially in the form of **Exhibit C** hereto (the "**Critical Vendor Agreement**"). Postpetition Critical Vendor Claims would be paid in accordance with the 120-day trade term arrangements agreed with the applicable Critical Vendor. The prepetition portion of the Critical Vendor Claims would be payable over forty-eight (48) months with the first installment of the repayment of the Critical Vendor Claims commencing on or about August 31, 2018, with each monthly payment budgeted in the amount of $1.25 million.

   d. <u>Fees</u>. None.

**The Critical Vendors**

  10. The Critical Vendors' continued support is vital to the Debtors' ability to continue to operate their business as a going concern and to maximize value for all creditors. As explained below, the Debtors require the funding to be provided under the Critical Vendor

Program to continue to operate as a going concern as they attempt to sell their assets or obtain a

restructuring transaction in chapter 11. If the Debtors are unable to obtain the postpetition credit

from the Critical Vendors under this Motion, they will be unable to continue to operate.

11.     The Debtors are also pursuing a potential sale or restructuring of their

business with the support of a group of their Critical Vendors. The Critical Vendors have agreed

that, rather than requiring the Debtors to immediately pay for both goods already delivered

prepetition and goods to be delivered postpetition, the Debtors will defer the repayment of the

Critical Vendor Claims. For goods delivered postpetition, this means the Debtors will not to pay

for those goods until 120 days after delivery. For goods delivered prepetition, the Debtors will

only pay a portion of the prepetition claim as described above over a period of 48 months. .

Thus, the Critical Vendor Program will allow the Debtors to use the cash derived from the sale of

the Critical Vendors' prepetition and postpetition goods to fund their operations and provide

working capital rather than to use the cash for the immediate repayment of the Critical Vendor

Claims.

12.     The Critical Vendor Program is crucial to the Debtors' ability to continue

to fund their operations as they endeavor to maximize the value of these estates for all

stakeholders. The Debtors have an urgent and immediate need for cash to continue to operate and

effectuate the sale or restructuring of their business for the benefit of creditors. Absent approval

of this Motion, The Debtors will not be able to pay current and ongoing expenses.

Consequently, the Debtors would suffer irreparable harm, thereby foreclosing any prospects for

success in these cases.

DOCS_DE:220490.13 59942/001

13.    If authorized to pay the Critical Vendor Claims, the Debtors will use commercially reasonable efforts to require the applicable Critical Vendor to provide trade terms as further described below and in the Critical Vendor Agreement (defined below).  Therefore, the Debtors request authority, but not the obligation, in their business judgment (subject to and in accordance with any orders authorizing postpetition financing and the use of cash collateral and the applicable budget thereunder), to condition payment on such Critical Vendor's entry into an agreement, substantially similar to the form of the letter attached as **Exhibit C** hereto (each a **"Critical Vendor Agreement"**), (i) to verify the amount owing to the specific Critical Vendor as of the Petition Date,  (ii) to require the Critical Vendor to accept such payment terms in satisfaction of all or a part of its claims; and  (iii)  to grant the Junior Liens more particularly described in Paragraph 9(b) of this Motion.

14.    Specifically, the terms of the Critical Vendor Agreement generally will provide as follows.  For those Critical Vendors willing to provide credit to the Debtors with at least 120-day terms (documented through customary invoice procedures), such Critical Vendor shall receive:  (a) a Second Lien Claim in the amount of the agreed-upon cost of goods advanced postpetition by such Critical Vendor to the Debtors, which claim is junior and subordinated in priority of payment of the Senior Secured Claims; *plus* (b) a Third Lien Claim on account of the Critical Vendor's prepetition claim. The Third Lien Claim would be junior and subordinated in payment priority on account of the goods provided by the Critical Vendor and satisfied only after payment of (i) the allowed Senior Secured Claims; and (ii) the allowed Second Lien Claims of Critical Vendors.  The amount of Third Lien Claim shall equal to the *lower* of: (i) the full

10

amount of new credit advanced postpetition by such Critical Vendor to the Debtors or (ii) 60% of

the amount of such Critical Vendor's prepetition claim.  As noted above, payment of the

postpetition critical vendor claims would be due 120 days after delivery of the goods and the

portion of the prepetition claim payable under this Motion would be payable over forty-eight

(48) months with the first payment of $1.25 million budgeted for payment to all Critical Vendors

on August 31, 2018.

       15.    The Debtors also request that all applicable banks and other financial

institutions be authorized to process and honor all checks presented for payment of Critical

Vendor Claims, and to honor all fund transfer requests made by the Debtors related to Critical

Vendor Claims, regardless of whether the checks were presented or fund transfer requests were

submitted before or after the Petition Date, provided that funds are available in the Debtors'

accounts to cover such checks and fund transfers.  In addition, in an abundance of caution, the

Debtors request that the Court enter an order confirming that all banks and other financial

institutions are authorized to rely on the Debtors' designation of any particular check as

approved by the attached Proposed Orders.

**Basis for Relief Requested**

## I.    The Court May Authorize Payment Terms for the Critical Vendor Claims Pursuant to Section 363 of the Bankruptcy Code

       16.    The Court may authorize the Debtors to pay the Critical Vendor Claims

under Bankruptcy Code section 363(b).  That section provides that "[t]he trustee, after notice and

a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the

estate." 11 U.S.C. § 363(b).  Under this section, a court may authorize a debtor to pay certain

11

prepetition claims. *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (finding that sound business justification existed to justify payment of certain claims); *Armstrong World Indus., Inc. v. James A. Phillips, Inc., (In re James A. Phillips, Inc.)*, 29 B.R. 391, 397 (S.D.N.Y. 1983) (authorizing contractor under section 363 to pay prepetition claims of some suppliers who were potential lien claimants because payments were necessary for general contractors to release funds owed to debtors); *In re Hancock Fabrics, Inc.*, No. 07-10353 (BLS) (Bankr. D. Del. Apr. 13, 2007) (pursuant to section 363, authorizing payment of prepetition claims to certain vendors deemed critical by debtors).

17.     As detailed above, the funding to be advanced by the Critical Vendors is a prerequisite to the Debtors' ability to continue to operate their business and to the success of these Chapter 11 Cases.  The Debtors are also pursuing a potential restructuring of the business that requires the support of the Critical Vendors.  Accordingly, the Debtors submit that the deferred repayment of the Critical Vendor Claims pales in comparison to the potential irreparable harm to the Debtors' business should the relief requested herein not be granted.  In light of the foregoing, the Debtors submit that they have a sound business purpose to provide for the payment terms for the Critical Vendor Claims.

## II.     The Court May Also Grant the Motion Pursuant to Its Equitable Powers Under Section 105(a) of the Bankruptcy Code and the Doctrine of Necessity

18.     Section 105(a) of the Bankruptcy Code authorizes the Court to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  The purpose of section 105(a) is "to assure the bankruptcy courts [sic] power to take whatever action is appropriate or necessary in aid of the

exercise of [its] jurisdiction." 2 Henry J. Sommer & Alan N. Resnick, *Collier on Bankruptcy* ¶ 105.01 (16th ed. 2018). Under section 105(a) of the Bankruptcy Code, courts may permit pre-plan payments of prepetition obligations when essential to the continued operation of a debtor's business. *See In re Just for Feet, Inc.*, 242 B.R. 821, 825 (D. Del. 1999). The Debtors submit that the relief requested in this Motion is critical to the Debtors' operations and is justified under section 105(a) of the Bankruptcy Code.

19.     Moreover, the relief requested in this Motion is supported by the well-established "doctrine of necessity." The United States Court of Appeals for the Third Circuit recognized the doctrine in *In re Lehigh & New England Railway Co.*, 657 F.2d 570, 581 (3d Cir. 1981). The Third Circuit held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor. *See id.* (stating courts may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *see also In re Penn Central Transp. Co.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding necessity-of-payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims have been paid"); *Official Comm. of Unsecured Creditors of Motor Coach Indus. Int'l v. Motor Coach Indus. Int'l. (In re Motor Coach Int'l, Inc.)*, No. 09-078, 2009 U.S. Dist. LEXIS 10024, at *9 (D. Del. Feb. 10, 2009) (reaffirming viability of doctrine of necessity in Third Circuit with respect to payment of prepetition critical vendor claims); *PBGC v. Sharon Steel Corp. (In re Sharon Steel Corp.)*, 159 B.R. 730, 736 (Bankr. W.D. Pa. 1993) (embracing "necessity of payment" doctrine

and citing *Leigh & New England Ry. Co.* with approval); *In re Columbia Gas Sys., Inc.*, 171 B.R.

189, 191-92 (Bankr. D. Del. 1994) (same). The rationale in these cases applies to the Debtors'

efforts to continue their business and to preserve the attendant going-concern value for the

benefit of their stakeholders.

20. Allowing the Debtors to provide for payment terms on account of the

Critical Vendor Claims is especially appropriate where, as here, doing so is consistent with the

"two recognized policies" of chapter 11 of the Bankruptcy Code—preserving going-concern

value and maximizing the value of property available to satisfy creditors. *See Bank of Am. Nat'l

Trust & Savs. Ass'n v. 203 N LaSalle St. P'ship*, 526 U.S. 434, 453 (1999).

21. Courts in this district regularly grant relief similar to that which the

Debtors are seeking in this Motion. *See, e.g.*, *In re Patriot Nat'l*, No. 18-10189 (KG) (Bankr. D.

Del. Feb. 1, 2018); *In re True Religion Apparel*, No. 17-11460 (CSS) (Bankr. D. Del. July 31,

2017); *In re CST Industries Holdings*, No. 17-11292 (BLS) (Bankr. D. Del. June 13, 2017); *In re

DirectBuy Holdings*, No. 16-12435 (CSS) (Bankr. D. Del. Nov. 3, 2016); *In re Verso Corp.*, No.

16-10163 (KG) (Bankr. D. Del. Jan. 27, 2016); *In re SFX Entertainment*, No. 16-10238 (MFW)

(Bankr. D. Del. Mar. 4, 2016); *In re Altegrity, Inc.*, No. 15-10226 (LSS) (Bankr. D. Del. Feb. 10,

2015). The Debtors respectfully submit that the requested relief is warranted in these Chapter 11

Cases because it is essential that they obtain the necessary funding under the Critical Vendor

Program. Without this funding, the Debtors will be simply unable to run their business and will

not be able to continue to operate under chapter 11.

**III.    The Court May Also Authorize the Relief Requested
        as a Valid Exercise of the Debtors' Fiduciary Duties**

22.    The Debtors, operating their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding the bankruptcy estate[s] and operating the business for the benefit of . . . [their] creditors and (if the value justifies) equity owners." *In re CoServ*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).  Implicit in the duties of a debtor in possession is the duty "to protect and preserve the estate, including an operating business's going-concern value." *Id.*

23.    It has been noted that there are instances in which a debtor in possession can fulfill its fiduciary duty "only . . . by the preplan satisfaction of a pre-petition claim." *Id.* The *CoServ* court specifically noted that preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate" and also when the payment was to "sole suppliers of a given product." *Id.* at 497-98.  The court provided a three-pronged test for determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's pre-petition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*Id.* at 498.

24.     Payment of the Critical Vendor Claims on the terms described herein meets the test set forth in *CoServ*. As described above, the Debtors, cannot operate without the funding provided under the Motion by the Critical Vendors. Finally, there exists no practical available alternative to the Critical Vendor payment terms described herein, which is extraordinary because the Critical Vendors are providing the Debtors with four months of trade terms for postpetition purchases of goods.

**IV.    The Debtors Should Be Permitted to Grant the Critical Vendor Liens Pursuant to Sections 364(c) of the Bankruptcy Code**

25.     The credit extended by the Critical Vendors to the Debtors contemplated under the Critical Vendor Program is authorized by section 364 of the Bankruptcy Code. Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that the debtors seeking postpetition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(l) of [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c). Section 364(c) also provides that the court may authorize the obtaining of credit or the incurring of debt "secured by a lien on property of the estate that is not otherwise subject to a lien," or "secured by a junior lien on property of the estate that is subject to a lien." 11 U.S.C. § 364(c)(2), (c)(3). Notably, the Debtors do *not* seek to prime any existing secured debt because any liens granted to the Critical Vendors will be Junior Liens. Moreover, in order to obtain a Third Lien on a portion of the Critical Vendors' prepetition claim, the Critical Vendor must provide new credit by advancing postpetition credit on 120-day terms to the Debtors in accordance with the Critical Vendor Program. Based on the fact that the Critical Vendor Liens

16

will be Junior Liens, the Debtors' prepetition lenders have also consented to the relief requested

under this Motion and the terms of the Critical Vendor Program.

26.     In evaluating proposed postpetition financing under section 364(c) of the

Bankruptcy Code, courts perform a qualitative analysis and generally consider similar factors,

including whether:

    a.   unencumbered credit or alternative financing without
         superpriority status is available to the debtor;

    b.   the credit transactions are necessary to preserve assets of the
         estate;

    c.   the terms of the credit agreement are fair, reasonable, and
         adequate;

    d.   the proposed financing agreement was negotiated in good faith
         and at arm's length and entry thereto is an exercise of sound and
         reasonable business judgment and in the best interest of the
         debtors' estate and its creditors; and

    e.   the proposed financing agreement adequately protects the
         prepetition secured parties.

*See, e.g.*, *In re Aqua Assoc.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the first

three factors in making a determination under section 364(c)); *In re Crouse Group, Inc.*, 71 B.R.

544 (Bankr. E.D. Pa. 1987) (same); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D.

Ga. 2003) (applying all factors in making a determination under section 364(d)).

27.     For the reasons discussed herein, the Debtors satisfy the standards

required to incur the debt associated with the granting of Critical Vendor Liens under sections

364(c) Bankruptcy Code.

**A.**    **The Proposed Terms for Critical Vendors, Including the Granting of Critical Vendor Liens, Is Necessary to Maximize the Value of the Debtors' Estates.**

28.    As more fully explained in the Bilbao Declaration, by providing credit to the Debtors with at least 120-day terms, Critical Vendors will provide the Debtors with the liquidity during these Chapter 11 Cases enable the Debtors to pursue dual paths of either a sale or a restructuring of their business. The Debtors have immediate need to the working capital that would be provided under the Critical Vendor Program in order to fund their operations. Without it, they cannot operate. In the absence of immediate access to cash and credit, the Debtors' operations would cease.

**B.**    **Financing on More Favorable Terms With Critical Vendors Was Unavailable.**

29.    The vast majority of the Debtors' assets are already highly leveraged, and the principal goal of these cases is to effectuate a going-concern sale of all or substantially all of the Debtors' assets or a restructuring. Under current circumstances, the Debtors were only able to obtain the required long-term financing on extremely favorable terms from the Critical Vendors. No other alternative financing from other sources on better terms was available. Notably, this credit in the form of 120-day terms will provide Critical Vendors with Critical Vendor Liens as only the Second Liens and the Third Liens, which are each subordinated and junior to the Senior Secured Claims.

30.    The Debtors respectfully submit that their efforts to obtain postpetition financing therefore satisfy the standard required under section 364(c) of the Bankruptcy Code. *See, e.g., In re Sky Valley, Inc.,* 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (where few lenders

can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing").

C.     **The Terms of the Critical Vendor Liens Are Fair, Reasonable, and Appropriate.**

31.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also In re Ellingsen MacLean Oil Co.*, 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

32.     The terms of the Critical Vendor Agreement and granting of Critical Vendor Liens, as described herein, were negotiated in good faith and at arm's length between the Debtors and the Critical Vendors.  The Critical Vendor Program is especially beneficial to the Debtors because, aside from providing the necessary working capital to fund their cases, repayment of the Critical Vendor Claims would be deferred.  Thus, the Debtors are able to apply the cash derived from the sale of the goods provided by the Critical Vendors to fund their chapter 11 cases and delay repayment the Critical Vendor Claims instead of being forced to deplete cash reserves through immediate payment these claims.

33.     As noted above, by virtue of the Junior Liens, the Critical Vendor Claims will be junior to the Senior Secured Claims.  The proposed terms are fair, reasonable, and appropriate under the circumstances, and should be approved.  *See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that section 364(d) of the Bankruptcy Code imposes no duty to seek credit from every possible

19

lender); *In re Western Pacific Airlines, Inc.*, 223 B.R. 567 (Bankr. D. Colo. 1997) (authorizing postpetition financing that would preserve the value of the debtor's assets).

> **D.      Entry Into the Critical Vendor Agreements and Granting of the Critical Vendor Liens Reflects the Debtors' Sound Business Judgment.**

34.      A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. *See, e.g., Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition credit facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment).

35.      Bankruptcy courts routinely accept a debtor's business judgment on many business decisions, including the decision to borrow money. *See, e.g., Group of Inst. Investors v. Chicago, Mil., St. P. & Pac.*, 318 U.S. 523, 550 (1943) (holding that decisions regarding assumption or rejection of leases are left to the business judgment of the debtor); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgments should be left to the board room and not to this Court"). Further, one court has noted that "[m]ore exacting scrutiny [of the debtors' business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank*, 762 F.2d 1303, 1311 (5th Cir. 1985).

36.     Bankruptcy courts generally will defer to a debtor in possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious, *In re Curlew Valley Assocs.*, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981); *see also Trans World Airlines, Inc.*, 163 B.R. at 974 (approving interim loan, receivables facility and asset-based facility based upon prudent business judgment of the debtor), and generally will not second-guess a debtor in possession's business decisions involving "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." *Curlew Valley*, 14 B.R. at 513-14 (footnotes omitted).

37.     For the reasons set forth above, the Debtors' sound business judgment clearly supports approval of the Motion and entry into Critical Vendor Agreements, including the granting of Critical Vendor Liens, in order to allow the Debtors to gain access to the required financing and thereby maximize value for all constituents.

**Bankruptcy Rule 6003 Is Satisfied and Request for Waiver of Stay**

38.     The Debtors further submit that because the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein and in the Kroll Declaration and Bilbao Declaration, Bankruptcy Rule 6003 has been satisfied and the relief requested herein should be granted.

39.     Specifically, Bankruptcy Rule 6003 provides as follows:

> Except to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, issue an order granting the following: . . . (b) a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or

> part of a claim that arose before the filing of the petition, but not a
> motion under Rule 4001 . . . .

Fed. R. Bankr. P. 6003.

40.    The Third Circuit Court of Appeals has interpreted the "immediate and irreparable harm" language in the context of preliminary injunctions. In that context, irreparable harm has been interpreted as a continuing harm that cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation. *See, e.g., Norfolk S. Ry. Co. v. City of Pittsburgh*, 235 F. App'x 907, 910 (3d Cir. 2007) (citing *Glasco v. Hills*, 558 F.2d 179, 181 (3d Cir. 1977)). Further, the harm must be shown to be actual and imminent, not speculative or unsubstantiated. *See, e.g., Acierno v. New Castle Cty.*, 40 F.3d 645, 653-55 (3d Cir. 1994).

41.    The Debtors further seek a waiver of any stay of the effectiveness of the order approving this Motion. Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As set forth above, the relief requested herein is essential to prevent irreparable damage to the Debtors' operations and going-concern value.

42.    Accordingly, the relief requested herein is appropriate under the circumstances and under Bankruptcy Rules 6003 and 6004(h).

### **Final Hearing**

43.    Pursuant to Bankruptcy Rule 4001(c), a final hearing on this Motion to grant the relief requested under section 364 of the Bankruptcy Code may not be commenced

until earlier than fourteen days after the service of such motion. Upon request, however, a bankruptcy court is empowered to conduct a preliminary expedited hearing on such motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to the Debtors' estates. *See* Fed. R. Bankr. P. 4001(c)(2). The Debtors request that the Court conduct an expedited hearing on the Motion prior to the final hearing and schedule a final hearing at the earliest possible date in accordance with Bankruptcy Rule 4001(c) to authorize the relief requested in the Motion on a final basis.

## **Notice**

44.     Notice of this Motion and any order entered hereon will be provided to: (i) the Office of the United States Trustee; (ii) each of the Debtors' thirty largest unsecured creditors on a consolidated basis; (iii) counsel for Encina Business Credit, LLC, as Administrative Agent and Collateral Agent, one of the Debtors' prepetition secured lenders; (iv) counsel for Gordon Brothers Finance Company, as Administrative Agent, one of the Debtors' prepetition secured lenders; (v) counsel for Israel Discount Bank of New York, as co-administrative agent and one of the Debtors' prepetition secured lenders; (vi) counsel to Michael Fallas; and (vii) any other party entitled to notice pursuant to Local Rule 9013-1(m). The Debtors submit that no other or further notice is necessary under the circumstances.

## **No Previous Request**

45.     No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, Debtors respectfully request that this Court enter an order granting the relief requested herein and granting such other and further relief as is just and proper.

Dated: August 6, 2018
      Wilmington, Delaware

PACHULSKI STANG ZIEHL & JONES LLP

Richard M. Pachulski (pro hac pending)
Peter J. Keane (DE Bar No. 5503)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
rpachulski@pszjlaw.com
pkeane@pszjlaw.com

-and-

KATTEN MUCHIN ROSENMAN LLP
William Freeman (pro hac pending)
Karen Dine (pro hac pending)
Jerry Hall (pro hac pending)
575 Madison Avenue
New York, NY 10022
Telephone: (202) 940-8800
Facsimile: (202) 940-8776
bill.freeman@kattenlaw.com
karen.dine@kattenlaw.com
jerry.hall@kattenlaw.com

*Proposed Attorneys for Debtors
and Debtors in Possession*