## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>J&M SALES INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 18-11801 (LSS)<br><br>Jointly Administered<br><br>Hearing Date (Omnibus): November 16, 2018 at 10:00 a.m. ET<br>Objection Deadline: November 9, 2018 at 4:00 p.m. ET<br>Reply Deadline: November 13, 2018 at 4:00 p.m. ET |

**PRIORITY PAYMENT SYSTEMS' AND SWIPE PAYMENT SOLUTIONS' REPLY IN SUPPORT OF MOTION FOR (I) ORDER DETERMINING THAT AUTOMATIC STAY DOES NOT APPLY, OR IN THE ALTERNATIVE, FOR RELIEF FROM THE AUTOMATIC STAY, (II) ADEQUATE PROTECTION, AND (III) ORDER COMPELLING DEBTORS TO ASSUME OR REJECT MERCHANT PROCESSING AGREEMENT**

Swipe Payment Solutions ("Swipe") and Priority Payment Systems[2], by and through their undersigned counsel, hereby file this reply together with the Reply Declaration of Andre A. Brown ("Brown Reply Decl.") in support of their motion (the "Motion") seeking the entry of an order (i) determining that the automatic stay does not apply to Priority and Swipe under the Merchant Processing Agreement between them and Debtors, or in the alternative, granting Priority and Swipe relief from the automatic stay *nunc pro tunc* to August 6, 2018 (the "Petition Date"); (ii) ordering adequate protection; (iii) compelling the Debtors to assume or reject the Merchant Processing Agreement; and (iv) granting Priority and Swipe such other and

---

[1] The Debtors in the above-captioned chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: J & M Sales Inc. (4697); National Stores, Inc. (4874); J & M Sales of Texas, LLC (5979); FP Stores, Inc. (6795); Southern Island Stores, LLC (8099); Southern Island Retail Stores LLC (4237); Caribbean Island Stores, LLC (9301); Pazzo FNB Corp. (9870); Fallas Stores Holdings, Inc. (6052); and Pazzo Management LLC (1924). The location of the Debtors' service address is 15001 South Figueroa Street, Gardena, California 90248.

[2] Priority Payment Systems is the successor in interest by way of a 2014 merger with Cynergy Data, LLC ("Cynergy"). Cynergy and Priority Payment Systems are collectively referred to herein as "Priority".

further relief as the Court deems just and proper. Undefined terms herein have the same definitions set forth in the Motion.

## I. Preliminary Statement

1. This Court may recall that when issues regarding the rights of Debtors' landlords came before the Court, in providing protections to the landlords, the Court appropriately recognized that if the landlords did not undertake ongoing risk, there would be no physical location for the Debtors to continue selling their goods and conducting their business. Similarly, by Priority continuing to provide credit and debit card processing services to Debtors, both before and after the recent going concern sale of 85 stores to Pegasus, Debtors have been able to continue the very substantial non-cash sales of its merchandise throughout the pendency of these chapter 11 proceedings. Notwithstanding the significant risk to Priority of additional data breaches based on Debtors' ongoing lack of compliance with industry PCI DSS protocol, Priority has continued uninterrupted during the entirety of these cases, including currently, to provide processing services to Debtors with the comfort of the Cash Management Order. Curiously, and in apparent contravention with the actual terms of the Cash Management Order, Debtors now assert that the comfort provided by the Cash Management Order is solely for the benefit of Debtors without any benefit afforded to the counterparties including Priority and Swipe. Without Priority continuing to provide processing services to Debtors under the terms of the MPA and the Cash Management Order, Debtors would not have been unable to consummate any sales other than for cash, effectively putting Debtors out of business. Moreover, Debtors would be unable to conduct the ongoing "going out of business" sales of the stores that were not sold to Pegasus. Further, Debtors are improperly in violation of applicable bankruptcy authority using Priority and the MPA to provide processing services to Pegasus, notwithstanding that Debtors admittedly no longer operate any of their businesses and did not seek to assume and assign the MPA to Pegasus. For the reasons set forth in the Motion and below, Debtors' opposition to the Motion lacks merit and the Court should grant the Motion.

2. <u>The Automatic Stay Does Not Apply</u>. First, based on the Cash Management Order, the automatic stay does not apply to Priority's post-petition enforcement of the MPA, including depositing funds into the Reserve. Pursuant to the Cash Management Order, without seeking modification of the automatic stay, Debtors sought to continue post-petition, their pre-petition arrangements related to their credit cards, necessarily including the MPA. In fact, Debtors referred specifically to Swipe, the ISO, in the motion underlying the Cash Management Order. Debtors requested permission to continue seamlessly post-petition, their pre-petition credit card services for their benefit to avoid any interruption in their cash flow, but now disingenuously seek to exclude from the definition of Credit Card Fees the very costs for which they are responsible but will be unable to pay because of their likely administrative insolvency. In fact, since the MPA explicitly allowed Priority to establish the Reserve for, among other things, fees and fines imposed by credit card companies with respect to Debtors' acts or omissions, and such fees and fines are "the fees associated with Debtors' acceptance of their customers' credit cards, including chargeback fees and other miscellaneous fees" (which is the language of the Cash Management Order that defines "Credit Card Fees"), Priority acted properly in reserving funds post-petition. Interestingly, nowhere in its response to the Motion do Debtors represent that administrative insolvency is not a substantial risk. Debtors' reliance on the automatic stay to argue that Priority and Swipe are not entitled to current payment of Credit Card Fees appears to be a scheme intended to deprive Priority and Swipe from ever receiving payment of these contractually mandated amounts.

3. <u>Cause for Relief From Stay Exists In Any Case</u>. Even if the Cash Management Order were not in effect, Priority's post-petition reserving would be proper because Priority would be entitled to relief from stay for cause under Bankruptcy Code Section 362(d)(1). Priority is being held hostage to continue providing processing services to Debtors while Priority is at significant risk of further data breaches by Debtors based on their non-compliance with PCI DSS, the damages for which would fall on Priority based on Debtors' likely administrative insolvency. Debtors' assertion that Priority is benefiting from processing for Debtors because

Priority gets to charge fees for doing so is incorrect. Priority has repeatedly explained to Debtors that Priority would like to be replaced with a new processor as soon as possible. Debtors, however, have been either unwilling or unable to find a new processor because no one will take on the risk in light of the Data Breach and Debtors' continued non-compliance with PCI DSS protocol. Debtors allege that Priority's risk is *less* today than it was on the petition date, but provide no evidence to support that allegation. By contrast, Priority has submitted the letter from Visa (Brown Decl, Exh. H) indicating that Debtors need to strengthen their data security - - meaning that their data security is weak - - by implementing point to point encryption or deploying EMV chip-enabled terminals, and if they do not, Visa will continue to assess monthly fees and fines for non-compliance until Debtors do so. If Debtors do not want Priority to resume reserving, then Debtors should consent to relief from stay to allow Priority to immediately terminate the MPA. But Debtors cannot have it both ways - - if they wish to continue utilizing Priority's processing services under the MPA, they should not be allowed to completely shift the significant risk of further data breaches to Priority.

4. <u>Priority Has Acted in Good Faith At All Times</u>. As set forth in Section B, paragraphs 12-17, of Priority's opposition [Dkt. No. 778] to Debtors' Motion for Entry of Order Awarding Damages for Willful Violations of the Automatic Stay (the "Stay Violation Motion"), which opposition Priority incorporates herein, Priority has acted in good faith at all times, even though Debtors continue to be non PCI DSS-compliant. Debtors' allege that Priority increased its reserve amounts because of Debtors' bankruptcy. As set forth below, however, over 75% of the funds Priority deposited into the Reserve post-petition were deposited before Priority even knew that Debtors had filed bankruptcy. Debtors' assertion that the timing of Priority's filing of its Motion was suspect is belied by the fact that (i) the parties had agreed to a standstill very early in the case only days after Priority received notice of the bankruptcy proceedings, (ii) Priority agreed to stop, and in fact stopped, reserving from and after the time of the standstill, and (iii) Priority continued to process for Debtors. By contrast, Debtors have acted in bad faith by, among other things, refusing to come into compliance with PCI DSS, denying the

applicability of the Cash Management Order to the MPA, including the Reserve, failing to acknowledge the constant and ongoing discussions between the parties and making other misrepresentations in their filings.[3]

5. <u>Debtors Remain Non-Compliant with PCI DSS</u>. Debtors are incorrect that they have become PCI DSS compliant. As set forth in the Brown Decl. and the Reply Brown Decl., because of the Data Breach, Debtors became a "Level 1" merchant, resulting in a higher required validation level, which requires that to be PCI DSS compliant, the Level 1 merchant take more stringent steps than a merchant that has not suffered a data breach. The bottom line is that the credit card companies, not Qualified Security Assessors, determine what steps a merchant must take to be compliant. Here, Visa determined that Debtors must implement point to point encryption or deploy EMV chip-enabled terminals, and Debtors undisputedly have not done so.

6. <u>Debtors Should Be Required to Assume or Reject the MPA Now</u>. This Court should compel Debtors, who admit that they will reject the MPA "at the earliest opportunity", to assume or reject the MPA immediately, as the Court may do under Bankruptcy Code Section 365(d)(2). Debtors should not be entitled to reap the benefits under the MPA and shift the risk of damages for which Debtors cannot answer to Priority, who has enabled and continues to enable Debtors to process their credit and debit card transactions throughout this case. Debtors have on several occasions told Priority that they have a new processor ready to take over. However, Debtors have been either unwilling or unable to find a new processor because of the Data Breach. Debtors admit that whether the counterparty to a contract is suffering harm or prejudice through continued utilization of contractual services is one basis for compelling assumption or

---

[3] For example, in paragraph 22, footnote 6 of their opposition to the Motion, Debtors misrepresent that they have no record of the amount of funds Priority deposited into the Reserve on August 6, 2018, the petition date. Debtors filed their opposition on November 9, 2018. Four days earlier, on November 5, 2018, at Debtors' request, Priority provided Debtors a full accounting showing, on a daily basis between December 22, 2017 (the date the Data Breach was discovered) and August 15, 2018 (the last date Priority deposited funds into the Reserve), the amount of funds Priority deposited into the Reserve. Priority did not deposit any funds into the Reserve on August 6, 2018.

rejection before plan confirmation (Opposition, paragraph 66). Here, while Priority continues to provide processing services to Debtors, Priority is facing harm and prejudice from damages from Debtors' potential further data breaches given their non-compliance with PCI DSS. Debtors should not be permitted to continue wringing all of the economic benefit from the MPA only to leave Priority and Swipe holding the bag at the end of the liquidation process with no source of payment for the very substantial post-petition amounts to which Priority and Swipe are contractually entitled.

7. <u>Priority is Entitled to Adequate Protection</u>. The Court should allow Priority to retain the $1.2+ million in post-petition Reserves (in which Priority has a security interest under Section 19 of the MPA) to protect Priority against potential damages and provide Priority with a superpriority administrative claim to the extent that the $1.2+ million is insufficient. The damages that Priority will suffer if Priority is not entitled to retain the $1.2+ million if a new data breach occurs or such funds are necessary to satisfy damages for the Data Breach, are much greater than any damages that Debtors might suffer if Priority is entitled to retain the $1.2+ million and new data breach does not occur or such funds are not necessary to satisfy damages for the Data Breach - - Priority will return such funds to Debtors. To the extent that Priority needs such funds to satisfy any damages, Priority is entitled to do so.

8. <u>The Damages to Priority Are Real and Partially Conditionally Quantified</u>. As set forth in the Motion and below, the potential damages just from the Data Breach that already has occurred could well exceed $5 million, plus another $600,000 for chargebacks. Moreover, Mastercard, which accounts for less than 20% of the compromised credit cards in the Data Breach, has very recently - - October 25, 2018 - - prepared a preliminary and conditional financial estimate of Operational Reimbursement (compromised card replacement) exceeding $435,000 (that could go higher), not including fraud recovery and PCI DSS non-compliance damages and other potential fees, assessments or the like.

9. <u>Debtors Have Violated the Bankruptcy Code and Are Acting Improperly by Allowing Pegasus to Utilize Priority's Processing Services Without Having Assumed and</u>

Assigned the MPA to Pegasus. Debtors entered the TSA and allowed Pegasus to utilize Priority's processing services under the MPA without any prior notice to Priority and without having assumed and assigned the MPA to Pegasus under the clear procedural and substantive requirements of Section 365 of the Bankruptcy Code. As set forth in Priority's opposition to the Stay Violation Motion (paragraph 23(f) and (g), pages 11-12), Debtors' actions violate Section 365 of the Bankruptcy Code. Moreover, Debtors assert that Priority is better off because the risk has been shifted to Pegasus and Priority is protected by Pegasus's credit (Opposition, paragraph 60). Debtors fail to point out that Michael Fallas, Debtors' principal who was personally flagged in the Data Breach, is also a principal of Pegasus. Moreover, there is no evidence of Pegasus's creditworthiness. In fact, the only way to determine Pegasus's creditworthiness is through a motion to assume and assign the MPA under Section 365 of the Bankruptcy Code, where Debtors would have to establish adequate assurance of Pegasus' future performance. Debtors failed to do so.

10. Priority and Swipe respectfully request that the Court grant the Motion and enter the Order attached to the Motion as Exhibit A.

## II. The Automatic Stay Does Not Apply

11. Priority incorporates its arguments from the Motion (Section IV, paragraphs 26-27) and its opposition to the Stay Violation Motion (Section II, paragraphs 9-11). Further, the Cash Management Order and underlying motion effectively eliminate the distinction between pre and post-petition operation under contracts relating to Debtors' bank accounts and credit card relationships, as the motion seeks permission, which the Court granted in the Cash Management Order, to effectively continue doing business seamlessly under its banking and credit card relationships post-petition in the pre-petition manner.

12. Further, contrary to Debtors' contention that "Credit Card Fees" in the Cash Management Order do not include the Reserve under the MPA (Opposition, paragraphs 41-43),[4] the definition of Credit Card Fees includes reserving funds for fees and fines under the MPA. Under the MPA, (i) Debtors are required to pay any fines resulting from chargebacks and any other fees or fines imposed by credit card companies with respect to Debtors' acts or omissions (MPA, Sections 7.1, 7.7), and (ii) Priority is entitled, without any notice whatsoever, to reserve funds in Priority's discretion by debiting Debtors' accounts to place funds in a reserve, i.e., the Reserve, for fees and fines imposed by credit card companies (MPA Section 19). Such fees and fines are "the fees associated with Debtors' acceptance of their customers' credit cards", which is the language in the cash management motion that defines "Credit Card Fees".

13. Debtors argue that the Cash Management Order did not modify the automatic stay with respect to the MPA or authorize assumption of the MPA (Opposition, paragraph 2). That is beside the point as. the Court did not need to modify the automatic stay or authorize assumption to empower Debtors and counterparties to operate post-petition under their pre-petition contracts. Under the Cash Management Order, this Court authorized Debtors and counterparties to continue to operate post-petition under their pre-petition banking and credit card relationships, including the MPA.

---

[4] Debtors attempt to distinguish between Credit Card Fees in the Cash Management Order and the Reserve, noting that the Reserve is a fund to protect against liability for fees (the term "Credit Card Fees" is highlighted by Debtors in paragraph 42 of the Opposition and defined by Debtors to include fees associated with Debtors' acceptance of their customers' credit cards - - which include the various fees described in the MPA). Irrespective of the fact that Debtors are incorrect for the reasons stated herein that Credit Card Fees do not include the Reserve, the Cash Management Order applies to *any* Credit Card Fees whether arising before or after the petition date. Therefore, apart from the Reserve, the Cash Management Order undisputedly authorizes Debtors and Priority to operate under the fee provisions of the MPA post-petition.

### III. Priority Has Acted in Good Faith at All Times

14. Priority incorporates its arguments from its opposition to the Stay Violation Motion (Section II(B), paragraphs 12-17). Moreover, Debtors' allegations of bad faith are contradicted by the undisputed evidence.

15. Debtors argue that Priority swept more in the first 10 days after the bankruptcy was filed than in the last 19 days before the bankruptcy was filed, asserting that Priority increased its rate of reserving because of the bankruptcy. Debtors' argument is belied by the facts. On August 1, 2018, five days *before* Debtors filed bankruptcy, Priority increased its reserve rate from 5% to 10% based on all available data. Thus, the increase had nothing to do with Debtors' bankruptcy filing. Moreover, of the $1.2+ million that Priority deposited into the Reserve post-petition, over $900,000 (75%) was deposited before Priority even learned that Debtors had filed bankruptcy as Debtors failed to provide notice of the commencement of the bankruptcy proceedings to Priority until August 10, 2018. This demonstrates that Priority increased the reserve rate because of the increased risk, not because Debtors filed bankruptcy proceedings.

16. Debtors argue that Priority's filing of the Motion was suspect (Opposition, paragraph 5) and that Priority waited to file the Motion until after Debtors filed the Stay Violation Motion (Opposition, paragraph 6). Debtors' argument is misleading and not correct. As admitted by Debtors, from the outset of the case and continuing until October 25, 2018, when Debtors filed the Stay Violation Motion, Debtors and Priority agreed to a standstill while trying to negotiate a resolution of the issues between them. Priority agreed to continue providing processing services to Debtors and stop reserving funds, and Priority has abided by that agreement even after Debtors terminated the standstill. Priority agreed to maintain the status quo and Debtors terminated the standstill. Priority had no reason to file the Motion while the standstill was in place and the parties were actively attempting to negotiate a resolution. Priority filed its Motion two days after Debtors unilaterally terminated the standstill.

17. Debtors argue that Priority's implementation and increase of the Reserve without notice to Debtors was improper (Opposition, paragraph 14). As Debtors admit by citing Section 19.2 of the MPA (Opposition, paragraph 14), "The Reserve Account may be funded without notice." Moreover, as evidenced by Exhibits G and I to the Brown Decl., Priority provided Debtors with notice of the increases to the Reserve and was in regular communication with Debtors about ongoing risk and compliance under the MPA.

18. Debtors argue that Priority informed Debtors that Priority was reserving funds only for liability from the breach that already had occurred, i.e., the Data Breach. Priority never limited the reserve to the Data Breach, but also reserved for potential future data breaches based on Debtors' continued non-compliance with PCI DSS protocol. Priority told Debtors that Priority would increase reserves in the event of any material change in the risk profile (Brown Decl., Exhs. C and E). Priority increased the reserve rate based on non-compliance with security protocol including the clear written requirements of Visa and *including* non-compliance at the time of the prior event. Accordingly, the increase in funds reserved was also based on continuing non-compliance – as demonstrated by and explained in Visa's July 17, 2018 letter (Brown Decl., Ex H).

## IV. Debtors Remain PCI DSS Non-Compliant

19. Priority incorporates the evidence of Debtors' continued non-compliance from the Motion (Section III(C), paragraphs 8-20). In addition, notwithstanding that the Trustwave report proffered by Debtors does not establish PCI DSS compliance (see below), just like Trustwave, Sylint, the DSS Forensic Investigator that prepared the report proffered by Priority concluding that Debtors need to implement point to point encryption (Brown Decl., Exh. B), is also a Qualified Security Assessor (Reply Brown Decl., paragraph 3). Moreover, any merchant that suffers a data breach that resulted in an account data compromise (like Debtors) may be - - and has actually been in the case of Debtors - - escalated to a higher required security validation level

(Reply Brown Decl., paragraph 4). As evidenced by Visa's letter (Brown Decl., Exh. H), Visa concluded that to come into compliance, Debtors would be required to provide higher validation by, among other things, implementing point to point encryption or deploying EMV chip-enabled terminals to all of Debtors' locations (Reply Brown Decl., paragraph 4).

20. Because Visa required either point to point encryption or EMV chip-enabled terminals, Debtors were required to do so to become compliant (Reply Brown Decl., paragraph 5). In the same letter, Visa indicated that it would continue to impose fines on an escalated basis for non-compliance if Debtors did not implement point to point encryption or deploy EMV chip-enabled terminals to all of Debtors' locations (Reply Brown Decl., paragraph 5). This establishes that Debtors are still not compliant and will continue not to be compliant until they do so.

21. With respect to the Trustwave report submitted with Debtors' opposition, that report does not establish Debtors' compliance. Trustwave performs network scans to assess compliance for regular merchants, i.e., not "Level 1" merchants like Debtors who have suffered a data breach (Reply Brown Decl., paragraph 8). While Debtors may have completed the standard requirements under PCI DSS for regular merchants who have not suffered a data breach, additional compliance steps are required of a Level 1 merchant that suffers a data breach (Id.). In this case, Visa unequivocally required Debtors to implement point to point encryption or deploy EMV chip-enabled terminals (Id.). Moreover, Visa pointed out in its letter, which was issued 7 days *after* the Trustwave report, that Debtors would have to provide validation of PCI DSS Version 3.2 by a new Quality Security Assessor. The credit card companies, not Trustwave, make the ultimate determination on becoming PCI DSS compliant (Id.).

22. Finally, with respect to the July 6, 2018 letter submitted by Debtors referred to as "PCI DSS Compliance Letter", such letter does not demonstrate compliance. First, it does not (because it cannot) show that Debtors implemented point to point encryption or deployed EMV chip-enabled terminals clearly required by Visa (Reply Brown Decl., paragraph 9). Second, the

letter provides no evidence that Debtors actually took the steps set forth in the letter (Id.). Third, the author of the letter is not a Qualified Security Assessor (Id.).

**V. The Damages to Priority Are Real and Partially Conditionally Quantified**

23. Priority incorporates its arguments from the Motion (Section III(G), paragraph 25). Debtors contend that there is only some vague risk of exposure for the Data Breach and future data breaches, arguing that Priority does not identify the risk. Debtors add that there is no actual injury to Priority. While assessments have not yet been made by the credit card companies, Debtors are incorrect - - See Brown Decl., Exhs B, D and H, and paragraphs 9 (Debtors' systems were compromised and card data remains at risk) and 23 (anticipated damages exceed $5 million for compromised card replacement and $600,000 for chargebacks, let alone fraud recovery and PCI DSS non-compliance damages). Moreover, on October 25, 2018, Mastercard prepared a preliminary and conditional financial estimate of Operational Reimbursement ("OR") - - which is compromised card replacement - - and Fraud Recovery ("FR") (Reply Brown Decl., paragraph 6 and Exh. J). Mastercard is still investigating the Data Breach and not completed the investigation (Id.). Mastercard did not include an estimate for FR (Id.). Mastercard included an estimate for OR in the amount of $435,208.53 (Id.). This estimate is preliminary and conditional only, and also does not address other potential fees, assessments or the like that may relate to or arise in connection with Debtors' Data Breach or future compromises of data (Id.). And this does not include Visa, Discover, American Express, and Debtors' other credit card companies (Id.). Based on the amount of Mastercard compromised cards as compared to the total amount of compromised cards, Mastercard accounts for less than 20% of the total amount of compromised cards resulting from the Data Breach (Id.). Thus, not only will the ultimate, overall liability by Mastercard likely well exceed $435,208.53, but there likely will be significant assessments from the other credit card companies as well.

24. Mastercard is only the first credit card company to provide an OR estimate or any estimate at all (Reply Brown Decl., paragraph 7). It is likely that Mastercard and the other credit card companies will provide final assessment amounts for OR, FR, PCI DSS non-compliance, and other potential fees, assessments or the like by the end of this year (Id.). Thus, allowing Priority to hold the $1.2+ million post-petition portion of the Reserve will not be indefinite as the actual economic damages will be liquidated shortly.

25. With respect to chargeback liability, Debtors challenge the $600,000+ estimate because there had been no reported fraud. First, there in fact has been reported fraud (Reply Brown Decl., paragraph 10). Second, the estimate is based on Priority's prior actual historical experience with Debtors dating back to 2014, and typical chargebacks are not limited to fraud. They also result from consumers not receiving goods or services supposedly sold or provided, or from goods being defective (Brown Decl., paragraph 23; Reply Brown Decl., paragraph 10).

26. Debtors assert that Priority paints a picture of increased exposure to avoid the consequences of willful violations of the automatic stay (Opposition, paragraph 9). Debtors are incorrect. First, Priority has not violated the automatic stay because the automatic stay is inapplicable based on the Cash Management Order. Second, Priority has been highlighting these risks to Debtors since the petition date and in the ongoing discussions between the parties. Third, within days after the petition date, the parties put the standstill into effect and Priority stopped reserving as the parties continued with substantive settlement discussions to address these very identified risks.

27. Debtors assert that the $3.7 million Reserve (which includes the $1.2+ million post-petition portion and the $2.4+ million pre-petition portion) is sufficient. However, as noted above, Priority's potential exposure is well in excess of $3.7 million. Priority needs to hold the Reserve – and be provided additional adequate protection for potential exposure in excess of the amounts actually reserved -- until the final assessments are made by the credit card companies and Priority's processing services have been terminated. Priority will return whatever portion of the Reserve is not needed to satisfy actual damages.

## VI. Debtors Have Violated the Bankruptcy Code and Are Acting Improperly by Allowing Pegasus to Utilize Priority's Processing Services Without Having Assumed and Assigned the MPA to Pegasus

28. Priority incorporates paragraphs 23 and 43 of the Motion and paragraphs 23(f) and 23(g) of its opposition to the Stay Violation Motion. Debtors admit that they are allowing Pegasus to use their credit card processing services provided by Priority (Opposition, paragraph 13). This is an admission that Debtors have *de facto* assumed and assigned the MPA to Pegasus without notice to Priority, without obtaining Court approval of the TSA, and without obtaining an order authorizing assumption and assignment of the MPA. This is an intentional end-run around and violation of Sections 365(a), (b) and (f)(2) of the Bankruptcy Code. *See also In Re Antwerp Diamond, Inc*., 138 B.R. 865, 867-868 (Bankr. N.D. Ohio 1992).

29. Debtors argue that allowing Pegasus to utilize Priority's processing services is beneficial because it spreads the risk (Opposition, paragraph 3) as Pegasus has assumed liability for certain of Debtors obligations of the MPA (Opposition, paragraph 4). Debtors are incorrect and the *de facto* assumption in circumvention of the requirements of Section 365 of the Bankruptcy Code actually exacerbated the risk. Pegasus has been unable to locate another processor because no other processor will assume such substantial risk for Pegasus. Michael Fallas, the former principal of Debtors who was personally cited in the Data Breach, is a principal of Pegasus. Debtors did not present the TSA to the Court in connection with the Pegasus Asset Purchase Agreement, and still have not done so to this day. Debtors did not provide prior notice to Priority of the *de facto* assignment of the MPA to Pegasus, and did not bring the TSA to the attention of Priority until the day before Debtors filed the Stay Violation Motion. Clearly, Debtors intentionally avoided the assumption and assignment process mandated by Section 365 of the Bankruptcy Code. These undisputed facts of Debtors' surreptitious conduct belie Debtors' incredible assertion that Priority has benefitted from the *de facto* assignment.

30. Debtors admit that they are no longer operating any of their businesses (Opposition, paragraph 12). This is an admission that Debtors are not entitled to continue utilizing Priority's processing services under the MPA, especially for the benefit of Pegasus. When a company goes out of business, it must assume and assign its executory contracts to the purchaser if the purchaser wishes to enjoy the benefits of the debtor thereunder. *Antwerp Diamond*, 138 B.R. at 867-868.

## VII.  Conclusion

31. Debtors have taken the position that Priority and Swipe should be compelled to involuntarily continue to provide processing services without any assurance that post-petition contractual obligations of the Debtors can be satisfied. Debtors insist on retaining the substantial benefits of continued processing of credit and debit card transactions without any clear or reliable means to perform their obligations under the MPA. In fact, in an apparent acknowledgement that Debtors cannot satisfy the statutory requirements for assumption and assignment of the MPA, Debtors have engaged in an intentional end run around the procedural and substantive safeguards provided by Section 365 of the Bankruptcy Code – by effectively assigning the MPA to Pegasus without the authorization of this Court. This Court should no longer tolerate Debtors' pattern of conduct which appears to be designed to wring every last benefit out of the MPA without any obligation to satisfy the very substantial obligations under the same contract. Based on the foregoing, Priority and Swipe respectfully request that the Court grant the Motion, deny the Stay Violation, Motion, and enter the Order appended to the Motion as Exhibit A (i) determining that the automatic stay does not apply to Priority's rights under the MPA, including reserving funds for the Data Breach and any future data breach, or alternatively granting relief from the automatic stay, (ii) providing adequate protection to Priority, (iii) compelling Debtors to immediately assume or reject the MPA, and (iv) pending assumption or

rejection of the MPA, directing Debtors to comply in all respects with all terms and conditions of the MPA.

Dated: November 13, 2018
      Wilmington, Delaware

**GIBBONS P.C.**

By: /s/ *Natasha M. Songonuga*
Natasha M. Songonuga, Esq. (Bar No. 5391)
300 Delaware Avenue, Suite 1015
Wilmington, DE 19801-1671
T: 302-518-6300
F: 302-429-6294
E-mail: nsongonuga@gibbonslaw.com

- and –

**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
Alan Feld, Esq.
Ted Cohen, Esq.
333 S. Hope Street, 43rd Floor
Los Angeles, CA 90071
E-mail: afeld@sheppardmullin.com
E-mail: tcohen@sheppardmullin.com