# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>J & M SALES, INC., *et al*,[1]<br><br>Debtors, | Chapter 11<br><br>Case No. 18-11801 (LSS)<br><br>Jointly Administered<br><br>Hearing Date (Omnibus): November 16, 2018 at 10:00 a.m. ET<br>Objection Deadline: November 9, 2018 at 4:00 p.m. ET<br>Reply Deadline: November 13, 2018 at 4:00 p.m. E.T. |

**REPLY DECLARATION OF ANDRE A. BROWN IN SUPPORT OF: (1) PRIORITY PAYMENT SYSTEMS' AND SWIPE PAYMENT SOLUTIONS' MOTION FOR (I) ORDER DETERMINING THAT AUTOMATIC STAY DOES NOT APPLY, OR IN THE ALTERNATIVE, FOR RELIEF FROM THE AUTOMATIC STAY, (II) ADEQUATE PROTECTION, AND (III) ORDER COMPELLING DEBTORS TO ASSUME OR REJECT MERCHANT PROCESSING AGREEMENT; AND (2) PRIORITY PAYMENT SYSTEMS' OPPOSITION TO DEBTORS' MOTION FOR ENTRY OF ORDER AWARDING DAMAGES FOR WILLFUL VIOLATIONS OF THE AUTOMATIC STAY**

I, Andre A. Brown, declare as follows:

1. I am the Anti-Money Laundering Officer and an Assistant Vice President, for Priority Payment Systems, LLC ("Priority") at Priority's office in Hicksville, New York.[2] I oversee the Special Investigations Unit that deals with cases related to account data compromise, loss prevention, and compliance. I have personal knowledge of the facts set forth herein, which are known by me to be true and correct, and if called as a witness, I could and would competently testify thereto.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: J & M Sales Inc. (4697); National Stores, Inc. (4874), J&M Sales of Texas, LLC (5979); FP Stores, Inc. (6795); Southern Island Stores, LLC (8099); Southern Island Retail Stores LLC (4237); Caribbean Island Stores, LLC (9301); Pazzo FNB Corp. (9870); Fallas Stores Holdings, Inc. (6052); and Pazzo Management LLC (1924). Debtors' mailing address is 15001 South Figueroa Street, Gardena, CA 90248.

[2] Priority is the successor in interest by way of a 2014 merger with Cynergy Data, LLC ("Cynergy"). Cynergy and Priority are collectively referred to herein as "Processor".

2. On October 26, 2018, I signed my Declaration that was filed the same day in this case [Dkt. No. 719-2] ("Prior Declaration"). I incorporate herein my Prior Declaration. Undefined capitalized terms herein have the same definitions set forth in my Prior Declaration.

3. Sylint, the DSS Forensic Investigator that prepared the report attached to my Prior Declaration as Exhibit B, is a Qualified Security Assessor, as reflected on the PCI SSC website listed in footnote 6 of the Declaration of Sean Hoar submitted by Debtors.

4. All merchants storing, processing or transmitting cardholder information are required by Visa and MasterCard to follow the Payment Card Industry Data Security Standard (PCI DSS). The PCI DSS includes but it not limited to, building and maintaining a secure network, protecting cardholder data, maintaining a vulnerability management program, implementing strong access control measures, regularly monitoring and testing networks, and maintaining information security policy. Visa and Mastercard also recommend that merchants use a Qualified Integrator & Reseller (QIR) listed on the PCI SSC website to implement a PCI DSS compliant payment application. Any merchant that has suffered a data breach that resulted in an account data compromise, such as Debtors, may be - - and in this case have been - - escalated to a higher validation level. Point-to-point encryption and EMV chip-enabled terminals are a higher validation level. As evidenced by Visa's letter attached to my Prior Declaration as Exhibit H, Visa concluded that to come into compliance, Debtors would have to provide higher validation by, among other things, implementing point-to-point encryption or deploying EMV-chip enabled terminals to all of Debtors' locations.

5. Because Visa required either point to point encryption or EMV chip-enabled terminals, Debtors were required to do so to become compliant. In the same letter, Visa indicated that it would continue to impose fines on an escalated basis for non-compliance if Debtors did not implement point-to-point encryption or deploy EMV-chip enabled terminals to all of Debtors' locations.

6. On October 25, 2018, Mastercard prepared a **preliminary** and **conditional** financial estimate of Operational Reimbursement ("OR") - - which is compromised card replacement - - and Fraud Recovery ("FR"). A copy of Mastercard's Letter in this regard is attached hereto as Exhibit J. As reflected in the letter, Mastercard is still investigating the Data Breach and has not completed the investigation. Mastercard did not include an estimate for FR. Mastercard included an estimate for OR in the amount of $435,208.53. Mastercard highlighted that these are preliminary, conditional estimates only, and also do not address other potential fees, assessments or the like that may relate to or arise in connection with Debtors' Data Breach. Of course, this does not include Visa, Discover, American Express, and Debtors' other credit card companies. Based on the amount of Mastercard compromised cards as compared to the total amount of compromised cards, Mastercard accounts for less than 20% of the total amount of compromised cards resulting from the Data Breach. Thus, not only will the ultimate, overall liability assessed by Mastercard likely well exceed $435,208.53, but there likely will be significant assessments from the other credit card companies as well, as reflected in my Prior Declaration.

7. Mastercard is only the first credit card company to provide an OR estimate or any estimate at all. While not a certainty, and being an estimate only, based on my experience, I expect that Mastercard and the other credit card companies will provide final assessment amounts for OR, FR, PCI DSS non-compliance, and other potential fees, assessments or the like by the end of this year.

8. I understand that Debtors assert that Trustwave deemed Debtors to be "PCI-compliant" on June 6, 2018. The Trustwave report does not establish Debtors' compliance. Trustwave performs network scans to assess compliance for regular merchants, i.e., not "Level 1" merchants like Debtors who have suffered a data breach. While Debtors may have completed the standard requirements under PCI DSS for regular merchants (ROC, AOC, and Network

Scan), additional compliance steps are required of a Level 1 merchant that suffers a data breach. In this case, Visa unequivocally required Debtors to implement point to point encryption or deploy EMV chip-enabled terminals. The credit card companies, not Trustwave, have the ultimate say on becoming PCI DSS compliant.

9. With respect to the July 6, 2018 letter to me from Sean Hoar (Exhibit D to the Hoar Declaration), which he refers to as the "PCI DSS Compliant Letter", such letter does not demonstrate compliance. First, it does not (because it cannot) show that Debtors implemented point to point encryption or deployed EMV chip-enabled terminals. Second, the letter provides no evidence that Debtors actually took the steps set forth in the letter. Third, Mr. Hoar is not a QSA.

10. Next Mr. Hoar challenges that chargeback liability could be well in excess of $600,000 because there has been no reported fraud. As I discussed in paragraph 4 of my Prior Declaration, while chargebacks can result from fraud, they also result from the consumer not receiving goods or services supposedly sold or provided, or from goods being defective. In paragraph 23 of my Prior Declaration, I noted that the estimate of more than $600,000 is based on Priority's experience with Debtors. Finally, there has been reported fraud. For example, on October 15, 2018, Priority received MC Global Merchant Audit Program ("GMAP") notification for Falls MID 3899000002596300. GMAP is a compliance program that identifies merchants that meet or exceed an established level of fraud in any one month based on program criteria using a rolling period of six month fraud data. The monthly trigger is 5 or more fraud transactions totaling $5,000 or more, with a fraud to sales total ratio of 8% or higher.

11. With respect to paragraph 22 of my Prior Declaration, there is one small discrepancy regarding our original understanding of the breakdown of the $2,467,334.97 pre-petition deposits to the Reserve. Pre-petition deposits currently in the Reserve that were deposited thereto prior to the 90 days preceding the bankruptcy filing were $1,994,330.18 (not

$2 million), and pre-petition deposits currently in the Reserve that were deposited thereto during the 90 days preceding the bankruptcy filing were $473,004.79 (not $467,334.97), a $5,669.82 difference. The total pre-petition deposits and the total post-petition deposits are accurately reflected in my Prior Declaration. Also, the last pre-petition deposit was made August 4, 2018.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed November 13, 2018, at Hicksville, New York.

DocuSigned by:

Andre A. Brown