## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| J & M SALES INC., *et al.,* | ) Case No. 18-11801 (LSS) |
| | ) |
| Debtors.[1] | ) Jointly Administered |
| | ) |
| | ) Hearing Date: TBD |
| | ) Objection Deadline: TBD |

**MOTION OF GORDON BROTHERS FINANCE COMPANY TO CONVERT DEBTORS' CHAPTER 11 CASES TO CASES UNDER CHAPTER 7 OF THE BANKRUPTCY CODE, PURSUANT TO 11 U.S.C. §§ 105 AND 1112**

Gordon Brothers Finance Company (the "Prepetition Term Loan Agent"), on behalf itself and its constituent lenders (such lenders, the "Prepetition Term Lenders"), by and through its undersigned counsel, submits this motion (the "Motion") pursuant to sections 105 and 1112 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), for entry of an order (i) converting the chapter 11 cases of the above-captioned debtors (the "Debtors") to cases under chapter 7 of the Bankruptcy Code and (ii) granting such other relief as this Court deems just, proper, and equitable. In support of the Motion, the Prepetition Term Loan Agent respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      As the Court is aware, these cases have not progressed as intended or as hoped for by any of the Debtors' constituents. The Debtors sold substantially all of their

---

[1]      The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: J & M Sales Inc. (4697); National Stores, Inc. (4874); J&M Sales of Texas, LLC (5979); FP Stores, Inc. (6795); Southern Island Stores, LLC (8099); Southern Island Retail Stores LLC (4237); Caribbean Island Stores, LLC (9301); Pazzo FNB Corp. (9870); Fallas Stores Holdings, Inc. (6052); and Pazzo Management LLC (1924). Debtors' mailing address is 15001 South Figueroa Street, Gardena, CA 90248.

assets almost two months ago, have now concluded any transition services, and have no ongoing "going concern" business operations. Instead, the Debtors now exist only to monetize their few remaining assets and distribute the cash proceeds to the Debtors' creditors.

2.      The timeline for that process, however, is uncertain as many of the remaining assets are litigation claims. Further exacerbating the uncertainty of litigation recoveries is the Debtors' inability to date to meet budgeted amounts for collections and costs of these cases. The Prepetition Term Loan Agent was in a "silent second" position for the first two months of these cases when critical decisions were being made regarding pursuing a plan, sale, or liquidation path and during which time substantially all of the Debtors' assets were sold. Once the first lien creditors were repaid, the Prepetition Term Loan Agent engaged with the Debtors to understand the remaining process and related costs. Seemingly every week since then, the situation has gotten worse and projections in the Debtors' budget go unmet.

3.      In addition, administrative creditors have begun to file motions seeking immediate payment of amounts not included in the already defective budget. Based on the Debtors' best-case scenario budget, it appears highly likely that the value of the Debtors' remaining assets does not support the cost of these cases in chapter 11 and will not repay the Prepetition Term Loan Agent and Prepetition Term Loan Lenders in full. As a result, it is almost certain that the Debtors' estates are administratively insolvent. Based on the continuing deterioration of these cases alone, the Prepetition Term Loan Agent believes that conversion as soon as practicable is in the best interests of all parties.

4.      Further, the Debtors have no ability to adequately protect the Prepetition Term Loan Lenders for the Debtors' continued use of the Prepetition Term Loan Lenders' cash collateral and the agreed timeframe for cash collateral usage has lapsed.  As set forth herein, there is simply no reason for the Debtors to continue in chapter 11, and deepen their likely administrative insolvency by incurring additional, material administrative expenses that have no chance of being repaid.  Of course, the Debtors could never confirm a plan under such circumstances.  Good cause exists to convert these cases to chapter 7 proceedings, and the Court should order as much to stop the continued accrual of administrative expenses and allow a trustee to complete resolution of the Debtors' cases and monetization of the Debtors' assets in an efficient and effective manner.

## JURISDICTION

5.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

6.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

7.      The statutory predicates for the relief sought herein are sections 105(a) and 1112 of the Bankruptcy Code.

## BACKGROUND

**A.      The Debtors and their Prepetition Capital Structure**

8.      On August 6, 2018 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.

9.      Upon the commencement of their bankruptcy proceedings, the Debtors had outstanding, secured credit facilities furnished by two (2) non-insider lender groups:  (i) a term loan credit facility (the "Prepetition Term Loan Facility") furnished by the Prepetition Term Loan Agent and Prepetition Term Lenders; and (ii) a revolving credit facility administered by Encina Business Credit and Israel Discount Bank of New York (as co-administrative agents) and certain other lenders (the "Prepetition ABL Facility").

10.     On the Petition Date, the outstanding obligations under the Prepetition ABL Facility totaled approximately $70.4 million, and the outstanding obligations under the Prepetition Term Loan Facility totaled approximately $30 million.  The obligations under the Prepetition Term Loan Facility and Prepetition ABL Facility are secured by validly perfected, first priority liens upon substantially all of the Debtors' assets.

11.     In addition to the Debtors' obligations in respect of the Prepetition Term Loan Facility and Prepetition ABL Facility, the Debtors also assert that on the Petition Date, the Debtors had outstanding obligations in excess of $10 million to an insider (Michael Fallas), secured by certain assets of the Debtors.  Any such obligations to Michael Fallas are fully subordinate to the Prepetition Term Loan Facility and Prepetition ABL Facility obligations.

**B.     The Debtors' DIP Facility**

12.     During their bankruptcy proceedings, the Debtors obtained a postpetition, revolving credit facility (the "DIP Facility") from affiliates of the same secured parties that furnished the Prepetition ABL Facility.  The Court approved the DIP Facility on a final basis in an order entered on September 20, 2018 (as amended, the "Final DIP Order", D.I.

467).  Like the Prepetition Term Loan Facility and Prepetition ABL Facility, the DIP Facility was secured by liens upon substantially all of the Debtors' assets.

13.    The Final DIP Order established a deadline to file a challenge action contesting the priority or perfection of any liens securing the Prepetition Term Loan Facility and/or Prepetition ABL Facility.  That challenge action deadline has now expired, foreclosing challenge to the perfection or priority of such liens.

14.    The Final DIP Order also established a payment waterfall for disbursement of the collateral securing the DIP Facility (which collateral comprised substantially all of the Debtors' assets).  Per the Final DIP Order, proceeds of DIP Facility collateral were to be used first to repay the DIP Facility and Prepetition ABL Facility, then, after repayment of the DIP Facility and Prepetition ABL Facility, to repay the Prepetition Term Loan Facility obligations.

## C.    The Debtors' Asset Sales

15.    The Debtors commenced their bankruptcy proceedings with the goal of consummating a sale of substantially all of their assets and using the proceeds from such asset sales to repay their prepetition secured creditors or consummating a chapter 11 plan.  Ultimately, a plan was not feasible and substantially all of the Debtors' operating assets were sold in going out of business inventory sales or through two separate sale transactions.  The first such transaction, approved by the Court in an order entered on October 12, 2018 (D.I. 640), closed on or about October 12, 2018.  The proceeds of that sale were used to, among other things, repay the DIP Facility and Prepetition ABL Facility in accordance with the terms of the Final DIP Order.

16.     The Debtors sold substantially all of their remaining, operating assets in a second sale transaction that was approved by the Court on October 17, 2018 (D.I. 670). That sale has also closed, and as a result, the Debtors have no ongoing, going concern business operations.  The Debtors' only remaining purpose is to monetize their few remaining assets, which appear to consist largely of litigation claims.

**D.      Cash Collateral Use by the Debtors Following the Sale Closings**

17.     As a result of the repayment of the DIP Facility and Prepetition ABL Facility, the Prepetition Term Loan Agent and Prepetition Term Loan Lenders have effectively functioned as the Debtors' first lien secured party from and after October 12, 2018.  Prior to such date, the Prepetition Term Loan Agent had little, if any, ability to comment on the DIP Facility documents, related orders, or the direction of these cases due to, among other things, limitations in an intercreditor agreement governing the Prepetition Term Loan Facility and Prepetition ABL Facility.  Shortly after the October 12, 2018 sale closing, the Debtors entered into an amendment of the Final DIP Order, which amendment was designed to provide rules and terms for the use of the Prepetition Term Loan Agent's cash collateral.  Under the Final DIP Order amendments, the Debtors were authorized to use cash collateral only in accordance with the terms of an approved budget.

18.     The first such budget was approved after the second sale closing (the "October Budget", D.I. 733) and contemplated that the Debtors would use the Prepetition Term Loan Agent's cash collateral for the months of November and December to both (i) wind down their business operations, and (ii) make periodic, weekly disbursements of cash collateral to the Prepetition Term Loan Agent in order to repay the more than $30 million of Prepetition Term Loan Facility claims.  That budget contemplated that the

Prepetition Term Loan Agent would be repaid in full, no later than the week ending January 4, 2019.

19.     However, the Debtors' actual financial performance was significantly worse than projected under the October Budget.  Such financial performance shortcomings were due to, among other things, inventory shrinkage that was materially larger than initially projected at the sale closings, which caused a reduction in the guaranteed purchase price formula computed in the Debtors' purchase agreement for their "non-going concern" store sale.  Though the Debtors and the Prepetition Term Loan Agent were able to subsequently negotiate a new cash collateral budget (the "December Budget", D.I. 1074) to account for the Debtors' lackluster financial performance, the December Budget confirms that the Debtors will not be able to make any meaningful distributions to the Prepetition Term Loan Agent in the foreseeable future.

20.     Presently, the Debtors' outstanding Prepetition Term Loan Facility obligations are in excess of $19,700,000, a balance almost $7 million higher than initially projected for that date in the October Budget.  Even worse, the December Budget does not make any provision for repayment of Prepetition Term Loan Facility obligations between November 30, 2018 and January 4, 2019.  Thus, instead of fully repaying the Prepetition Term Loan Agent by January 4, 2019 (as projected in the October Budget), the Debtors now project that as of January 4, 2019, the Prepetition Term Loan Agent will still be owed in excess of $19,700,000 (almost 2/3 of the amount outstanding on the Petition Date).

21.     Though the December Budget does project at that some point the Debtors will make additional distributions to the Prepetition Term Loan Agent: (i) such distributions are almost entirely dependent upon the Debtors generating almost $12 million

from the liquidation of unspecified "claims" at an unknown future date; and (ii) such

distribution assumption depends upon the Debtors incurring **_no_** other operating

disbursements, non-operating disbursements, or professional fees in connection with the

liquidation of such claims. At this point, the Prepetition Term Loan Agent does not believe

that such collection projections are reasonable, as, among other things, they are premised

upon a settlement of certain credit card claims above the actual, negotiated settlement

amount, the Debtors have previously underperformed their budgeted results, and the

Debtors have already encountered delays in respect of pursuing the business interruption

claims included in the December Budget.

22.     Worse yet, even assuming *arguendo* that such collection assumptions are

reasonable (which they are not), all such assumptions (including the incurrence of no

additional operating costs or professional fees) would still only be projected to produce

$17.6 [2] million of additional proceeds. The Prepetition Term Loan Facility obligations are

presently approximately $19.7 million and lower priority administrative costs continue to

accrue. In short, the Debtors' own December Budget confirms that the Debtors will be

unable to repay their senior secured Prepetition Term Loan Facility Obligations, *even*

*assuming that the Debtors do not incur (or pay) any additional postpetition expenses*. The

---

[2] Though not explicitly reflected in the December Budget, upon information and belief, the Debtors' ultimate payment to the Prepetition Term Loan Agent upon the liquidation of unspecified "claims" may be premised upon the Debtors' expenditure of the Prepetition Term Loan Agent's cash collateral to pay certain other claims that are subordinate to the Prepetition Term Loan Agent. The Prepetition Term Loan Agent has not consented to, and by submitting this Motion is not consenting to, the disbursement of any of the Prepetition Term Loan Agent's cash collateral to pay such subordinated costs and expenses. The only costs and expenditures authorized by the Prepetition Term Loan Agent are the expenditures expressly set forth in the December Budget through the week ended January 4, 2019.

recent influx of administrative claim motions and the continual high costs of these cases[3] demonstrate the need for conversion at this time.

23.     Because all of the Debtors' assets are encumbered by the Prepetition Term Lenders' unavoidable liens and claims and the Debtors' own projections confirm that such proceeds will not be sufficient to repay the Prepetition Term Lenders, it is highly likely that the Debtors' estates are administratively insolvent.  Continued operation in chapter 11 would thus likely only result in the accrual of additional administrative expenses that have no reasonable prospect of payment and further deepen the Debtors' administrative insolvency.

## RELIEF REQUESTED

24.     By this Motion, the Prepetition Term Loan Agent respectfully requests the entry of an order pursuant to sections 105(a) and 1112 of the Bankruptcy Code, converting these cases to cases under chapter 7 of the Bankruptcy Code.

## BASIS FOR RELIEF

### A.     Pursuant to Section 1112 of the Bankruptcy Code, Cause Exists to Convert the Debtors' Chapter 11 Cases to Cases under Chapter 7.

25.     Pursuant to section 1112 of the Bankruptcy Code, cause exists to convert these cases to chapter 7 for the benefit of all the creditors as the cases involve post-sale Debtors with little resources and no viable method of fully repaying the Debtors' obligations to the Prepetition Term Loan Agent or a variety of other postpetition and administrative expenses.

---

[3] Based on present filings mostly covering the period through November, the Debtors' primary professionals have accrued over $6 million in professional fees.

26.     The primary purpose of chapter 11 is to restructure a company's finances

so that it may continue to operate and provide a benefit for all its stakeholders including its

employees and creditors - none of which the Debtors can accomplish here.

> A principal goal of the reorganization provisions of the Bankruptcy
> Code is to benefit the creditors of the Chapter 11 debtor by
> preserving going-concern values and thereby enhancing the
> amounts recovered by all creditors. . . . [W]hen there is no
> reasonable likelihood that the statutory objective of reorganization
> can be realized . . . , then the automatic stay and other statutory
> provisions designed to accomplish the reorganization objective
> become destructive of the legitimate rights and interests of creditors,
> the intended beneficiaries.  In that situation it is incumbent upon the
> bankruptcy judge to effectuate the provisions of the Bankruptcy
> Code for the protection of creditors.

*In re Timbers of Inwood Forest Associates, Ltd., 808 F.2d 363, 373 (5th Cir. 1987) aff'd*

*sub nom. United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484

U.S. 365, 108 S. Ct. 626, 98 L. Ed. 2d 740 (1988).

27.     Under section 1112(b)(1) of the Bankruptcy Code, a court shall convert a

chapter 11 case to a chapter 7 case "for cause" upon a request of a party in interest.  Section

1112(b)(1) provides:

> Except as provided in paragraph (2) and subsection (c), on request
> of a party in interest, and after notice and a hearing, ***the court shall
> convert a case under this chapter to a case under chapter 7*** or
> dismiss a case under this chapter, whichever is in the best interests
> of creditors and the estate, for cause … .

*See* 11 U.S.C. § 1112 (emphasis added).

28.     Prior to the 2005 amendments to the Bankruptcy Code, section 1112(b)

contained the language "may convert" as opposed to the "shall convert" language which

now appears in section 1112(b). *In re Midwest Properties of Shawano, LLC,* 442 B.R. 278,

283 (Bankr. D. Del. 2010) ("[t]he statutory language has been changed from the permissive

. . . to mandatory."). One of the courts to directly address this change to section 1112(b) of the Bankruptcy Code observed:

> If cause for dismissal or conversion to Chapter 7 exists discretion not to dismiss or convert is limited to those instances in which the court makes specific findings that unusual circumstances establish that the requested conversion or dismissal is not in the best interests of creditors and the estate . . . .

*In re Broad Creek Edgewater, LP*, 371 B.R. 752, 759 (Bankr. D.S.C. 2007) (internal citations omitted). Here, this Court is authorized to convert the Debtors' chapter 11 cases to cases under chapter 7 upon a showing of cause.

29.     A determination of cause is made by courts on a case-by-case basis. *See Halvajian v. Bank of New York (In re Halvajian)*, 216 B.R. 502, 511 (D.N.J. 1998). As set forth herein, the totality of circumstances show the Debtors' cases should be converted to a chapter 7 because the Debtors' estates cannot confirm a chapter 11 plan and fully repay their obligations to the Prepetition Term Loan Agent, even assuming that the Debtors do not need to pay any other postpetition or administrative expenses.

30.     Further, though the Debtors would certainly need to incur additional administrative expenses to continue operating in chapter 11, there is no source (other than the Prepetition Term Loan Agent's cash collateral) that can be used to fund such expenses. The Debtors could never establish any basis for adequately protecting the Prepetition Term Loan Agent for the use of its cash collateral to fund a continued, sideways drift in chapter 11. Because the Debtors cannot establish a basis for further use of cash collateral, and also cannot repay the Prepetition Term Loan Agent, the Debtors' estates are likely in an intractable state of administrative insolvency. Thus, allowing the Debtors to continue to

accrue administrative claims will merely exacerbate the Debtors' administrative insolvency with no method for satisfying the additional administrative claims incurred.

31.     Section 1112(b)(4) of the Bankruptcy Code provides a nonexclusive list of what constitutes cause under section 1112 of the Bankruptcy Code.   Pursuant to section 1112(b)(4) of the Bankruptcy Code, cause exists to convert a case where a party-in-interest shows that there is an inability to effectuate substantial consummation of a plan of reorganization or liquidation and the diminution in the value of the estate.  *See* 11 U.S.C. § 1112(b)(4).

32.     Section 1112(b)(4) of the Bankruptcy Code provides in relevant part:

> For purposes of this subsection, the term 'cause' includes—
>
> > (A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;

*See* 11 U.S.C. § 1112(b)(4)(A).

33.     Here, cause exists to convert this case to a Chapter 7 case under section 1112(b)(4)(A) of the Bankruptcy Code.

34.     The Debtors have sold substantially all of their assets and are highly unlikely to have remaining assets of significant value to render these estates solvent enough to continue operating in chapter 11.  The Debtors appear to have no viable method to repay the Prepetition Term Loan Facility obligations in full, no capacity to provide the requisite adequate protection to the Prepetition Term Loan Agent for the continued use of cash collateral, and thus are likely administratively insolvent due to their inability to repay any administrative expenses that the Debtors would continue to incur if they are allowed to continue to languish in Chapter 11.  For these reasons, any further use of the Debtors' very

limited resources to fund a case under chapter 11 of the Bankruptcy Code is not warranted and only results in an unnecessary drain on estate assets. *In re Schriock Const. Inc.*, 167 B.R. 569, 575 (Bankr. D.N.D. 1994)(citing *In re First Lewis Road Apts., Inc.*, 11 B.R. 575, 576 (Bankr. E.D. Va. 1981); *see also In re Great Am. Pyramid Joint Venture*, 144 B.R. 780, 791 (Bankr. W.D. Tenn. 1992) ("when no or substantially no business is left to reorganize, chapter 11 cases do not serve those purposes, and 'cause' exists [for conversion].").

36. Furthermore, there are no available cash resources to confirm a viable plan under chapter 11. Without an independent source of cash flow or assets of value to liquidate, the Debtors cannot satisfy the feasibility requirement to confirm a plan under section 1129 of the Bankruptcy Code. *See In re Hinchliffe*, 164 B.R. 45, 52 (Bankr. E.D. Pa. 1994) ("Without a source of income, it is highly unlikely that debtors will be able to propose a confirmable plan); *In re Rundlett*, 136 B.R. 376, 380 (Bankr. S.D.N.Y. 1992) (a debtor who lacks independent cash flow "cannot expect to be supported by money that belongs to the creditors as property of the estate").

**B.    The Equities Favor Converting the Debtors' Chapter 11 Cases to Cases Under Chapter 7 of the Bankruptcy Code**

36. The relief sought herein is also appropriate pursuant to this Court's equitable powers under section 105(a) of the Bankruptcy Code. *See In re Schriock Const., Inc.*, 167 B.R. 569, 575 (Bankr. D.N.D. 1994) (court considered equitable factors in granting a motion to convert a chapter 11 case to a chapter 7 case). It is well settled that bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the administration of bankruptcy proceedings. *See In re Official Comm. of Unsecured Creditors of Cybergenics Corp.*, 330 F.3d 548, 567 (3d Cir.

2003); *Pepper v. Litton*, 308 U.S. 295, 304 (1939).  Section 105(a) states that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

37.    As courts commonly acknowledge, section 105 of the Bankruptcy Code confers broad powers on bankruptcy courts:

> [Section] 105 [is] an omnibus provision phrased in such general terms as to be the basis for a broad exercise of power in the administration of a bankruptcy case.  The basic purpose of [section] 105 is to assure the bankruptcy courts power to take whatever action is appropriate or necessary in aid of its jurisdiction . . . .

*Davis v. Davis (In re Davis)*, 170 F.3d 475, 492 (5th Cir. 1999) (internal citations and quotations omitted); *See also In re Kaiser Aluminum Corp.*, 456 F.3d 328, 340 (3d Cir. 2006).  Under section 105(a) of the Bankruptcy Code, this Court has expansive equitable power to fashion any order or decree that is in the interest of preserving or protecting the value of the Debtor's estate.  *See Coie v. Sadkin (In re Sadkin),* 36 F.3d 473, 478 (5th Cir. 1994).

38.    In this case, the Debtors lack the ability carry out a plan for purposes of section 1112 of the Bankruptcy Code, thus warranting conversion to chapter 7.

39.    In sum, for all the various reasons set forth herein, the only fair and equitable course here is to allow for an orderly liquidation of the Debtors.  The most efficient setting to allow for this orderly liquidation is as a chapter 7 case for the benefit of all the creditors under the direction of a fiduciary in the form of a chapter 7 trustee.  Accordingly, the Prepetition Term Loan Agent urges this Court to order the conversion of these cases to chapter 7, consistent with the policy of equitable treatment of creditors set forth in the Bankruptcy Code.

## **NOTICE**

40.     Notice of the Motion has been given to: (1) the United States Trustee for the District of Delaware, (2) counsel to the Debtors, (3) counsel to the Official Committee of Unsecured Creditors, and (4) all parties that timely have requested notice in these cases. The Prepetition Term Loan Agent submits that no other or further notice is required.

## **CONCLUSION**

WHEREFORE, the Prepetition Term Loan Agent respectfully requests that this

Court enter an order, substantially in the form attached here to as <u>Exhibit A</u>, converting the

Debtors' bankruptcy cases from chapter 11 of the Bankruptcy Code to cases under chapter

7 of the Bankruptcy Code and granting such other, further and different relief as this Court

deems just, proper, and equitable.

Dated: January 7, 2018
Wilmington, Delaware

                        BAYARD, P.A.

                        */s/ Erin R. Fay*
                        Justin Alberto (No. 5126)
                        Erin Fay (No. 5268)
                        600 N. King Street, Suite 400
                        Wilmington, DE 19801
                        Tel: (302) 655-5000
                        Fax: (302) 658-6395
                        E-mail: jalberto@bayardlaw.com
                        efay@bayardlaw.com

                        -and-

                        HOLLAND & KNIGHT LLP
                        Robert Jones
                        Jay DelMonico
                        200 Crescent Court, Suite 1600
                        Dallas, TX 75201
                        Tel: (214) 964-9500
                        Fax: (214) 964-9501
                        E-mail:  robert.jones@hklaw.com
                        jason.delmonico@hklaw.com

                        *Counsel for the Prepetition Term Loan Agent*

{BAY:03420995v1}#62583476        16