IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>J & M SALES, INC., *et al.*[1]<br>        Debtors. | Chapter 7<br><br>Case No. 18-11801 (LSS)<br><br>(Jointly Administered)<br><br>Hearing Date: March 26, 2019 at 10:00 a.m. (ET)<br>Objection Deadline: March 19, 2019 at 4:00 p.m. (ET)<br><br>Re: Docket Nos. 1343 & 1363 |

**REPLY MEMORANDUM OF PEGASUS TRUCKING, LLC, IN SUPPORT OF MOTION FOR ORDER: (I) ENFORCING COURT'S NOVEMBER 23, 2018, STIPULATED ORDER; (II) HOLDING PRIORITY PAYMENT SYSTEMS, INC., AND SWIPE PAYMENT SOLUTIONS, INC., IN CONTEMPT FOR FAILURE TO COMPLY WITH ORDER AND ENGAGING IN RELATED MISCONDUCT; AND (III) <u>AWARDING SANCTIONS AND OTHER RELIEF</u>**

Pegasus Trucking, LLC ("<u>Pegasus</u>"), by and through its undersigned counsel, hereby submits its reply memorandum in support of its "Motion For Order: (I) Enforcing Court's November 23, 2018, Stipulated Order; (II) Holding Priority Payment Systems, Inc., And Swipe Payment Solutions, Inc., in Contempt For Failure to Comply With Order And Engaging in Related Misconduct; And (III) Awarding Sanctions And Other Relief" [Dkt. No. 1343] (the "<u>Motion</u>"), and, in connection therewith, respectfully states as follows:[2]

## INTRODUCTION

1.  The Processors' opposition, like their Emergency Motion, is completely without support, is devoid of declarations or other forms of admissible evidence, and represents the

---

[1] The Debtors in the above-captioned chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: J & M Sales Inc. (4697); National Stores, Inc. (4874); J & M Sales of Texas, LLC (5979); FP Stores, Inc. (6795); Southern Island Stores, LLC (8099); Southern Island Retail Stores LLC (4237); Caribbean Island Stores, LLC (9301); Pazzo FNB Corp. (9870); Fallas Stores Holdings, Inc. (6052); and Pazzo Management LLC (1924). The location of the Debtors' service address is 15001 South Figueroa Street, Gardena, California 90248.

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

predictable response that Pegasus anticipated. What it does is confirm that Processors engaged in the very acts of which they are accused, representing misrepresentations to the Court and intentional violations of the Stipulated Order. The Processors now attempt to downplay those violations by repeating their accusation that Pegasus seeks a "windfall," and contend their breaches were justified and resulted in no harm to Pegasus. Taking unilateral self-help measures in knowing violation of a Court order, on its face, cannot be justified and remains sanctionable, irrespective of its impact on the opposing party.[3]

2.  Contrary to the Processors' contentions, the Stipulated Order imposes no obligation on Pegasus to return any funds, nor is there any other mandate that compels the payment of money to the Processors. To the contrary, that Order imposes explicit obligations and duties on the Processors to limit their withholdings of Pegasus's cash. The Processors were (and are) aware of those obligations, but unilaterally chose to breach them. They concede (or otherwise do not dispute) these facts. Instead, they attempt to argue – no harm, no foul.

3.  The Motion identified at least four forms of violations and other misconduct. As detailed below, none is in bona fide dispute:

    a.  *First*, the Processors concede the Stipulated Order capped their withholdings of future collections up to a maximum of $650,000, yet they do not dispute that their own accounting records show they withheld at least $743,456.89 of such collections through December 22, 2018.

---

[3] A significant predicate underlying the Processors' opposition (as well as their separate Emergency Motion) is the bizarre notion that Pegasus somehow is obtaining a "windfall" when it received its *own* money. A "windfall" necessarily implies an "unexpected" or "unearned" gain. *See* https://www.merriam-webster.com/dictionary/windfall. Such cannot be the case here, even if the Processors allegedly, inadvertently did not retain $1.0 million in collections. No reasonable argument can be made that those funds do not represent collections from Pegasus's sales and that the proceeds thereof belong to Pegasus, not the Processors. A party does not obtain a "windfall" when it obtains its own money.

        b.       *Second*, the Processors concede the Stipulated Order allowed them to withhold only up to 15% of collections, yet they expressly admit they withheld 100% of collections for the period between December 23, 2018, and January 1, 2019 (the "100% Holdback").

        c.       *Third*, the Processors concede the Court did not provide them with the "comfort order" they were seeking at the December 20 hearing to permit them to withhold more than 15% of collections, yet they admittedly withheld more than 15% of collections. The position the Processors advance now is that they required no order from the Court to allow them to exceed the 15% withholding cap. This specious argument is belied by the very fact that they expressly sought – and, to date, still seek – that exact form of relief in the Emergency Motion.

        d.       *Fourth*, the Processors concede they provided different accounting reports with different information (Opposition, p. 14-15) and, while asserting the reports covered different time periods with additional information, this assertion does nothing to explain why they provided *patently conflicting* information in the reports.

4.       Aside from trying to justify the clear violations identified in the Motion, the Processors allot a relatively significant number of pages of their opposition to identify alleged "material misrepresentations" in the Motion. No such material misrepresentations exist.

5.       Furthermore, the Processors supply absolutely no evidence to support their claims of misrepresentations. The Processors presented no evidence with the Emergency Motion and present no evidence now in support of their opposition. As a result, the allegations of misrepresentations are nothing more than bald statements, have no probative value, and should be disregarded.

6.       Rather, the only evidence presently before the Court is that submitted with the

Motion. That evidence – and the admissions in the current opposition – confirm the Processors violated the Stipulated Order and engaged in other improper conduct.

7. For these and other reasons discussed, the Motion should be granted.

## THE PROCESSORS CONCEDE THEY KNOWINGLY VIOLATED THE STIPULATED ORDER AND PARTICIPATED IN RELATED MISCONDUCT

8. Engaging in self-help measures in contravention of Court rulings were not justified and subject the violators to contempt and sanctions. This is especially true when considering the fact that the Processors could have filed, *and did file*, a motion for authority to engage in those very same acts (which motion, to date, has not been granted). *See, e.g.*, *Canon U.S.A., Inc. v. Lease Group Res., Inc.*, 2005 U.S. Dist. LEXIS 7452, *12-13 (E.D. Va. April 19, 2005) (holding that "where a party could have filed a motion . . . but instead engages in self-help, the trial court [is] left with 'no alternative except restoration of the status quo ante bellum by a coercive contempt order" and imposing sanctions when party engaged in self-help by "withholding amounts [it] believes it is entitled to withhold").

9. As noted above, the Motion highlights four incidents of misconduct. As discussed below, the Processors do not dispute they engaged in such conduct. Rather, the Processors attempt to soften the impropriety of their acts by claiming they were justified in taking the self-help measures.

***The Processors Concede They Withheld More Than $650,000 And More Than 15% of Then-Future Collections, And Disregarded The Court's Refusal to Grant The Comfort Order They Specifically Sought***

10. No dispute exists that the Stipulated Order provides that, separate and distinct from the $1 Million Reserve, the Processors were entitled to reserve up to 15% of collections up to a maximum of only another $650,000 from debit and credit card collections through December 31, 2018 (when the Processors' services would terminate). Further, no dispute exists

that, based on their own accounting records, the Processors withheld significantly more than 15% and significantly more than $650,000.[4] More specifically, as set forth in the Motion (and supported by the Processors' accounting), through December 21, 2018, the Processors admittedly withheld $743,456.89 of such collections, almost $100,000 more than the $650,000 cap clearly identified in the Stipulated Order, and withheld 100% of collections between December 23, 2018, and January 1, 2019.

11.     Finally, no dispute exists that the Court did *not* issue any comfort or other order at the December 20 hearing (and that their Emergency Motion still remains pending and unadjudicated).

12.     To excuse the Processors' self-help measures, the Processors advance two primary arguments: (a) that they were permitted to withhold more than $650,000 to reach the $1,650,000 total allowed reserve amount; and (b) that they did not need any "comfort order" from the Court because they were entitled to reserve up to $1,650,000. Neither justifies the Processors' actions.

13.     First, the $1 Million Reserve is separate and distinct from the maximum $650,000 reserve to be generated from future collections[5]. The provisions for these two reserves are contained in two separate paragraphs of the order and were to be achieved through two separate means.

14.     The $650,000 reserve only applied to, and was to be achieved through, collections

---

[4] This encompasses two of the violations identified in the introduction above: (a) violation of the percentage cap on reserves from future collections; and (b) violation of the dollar amount cap on reserves from future collections.

[5] It should be noted that the Processors were not guaranteed an additional reserve of $650,000. That amount was a cap on future collections. Had the collections processed post November 23, 2018 been insufficient to create a reserve of $650,000 through a 15% holdback, the Processors were limited to 15%, regardless of the amount.

"[g]oing forward." *See* Stipulated Order, ¶ 2. On the other hand, the $1 Million Reserve related to, and was to be achieved by a withholding of funds already in the Processors' possession at the time. *See* Stipulated Order, ¶ 3. In other words, the Stipulated Order did *not* permit the Processors to withhold *future* collections to achieve the $1 Million Reserve. But that is exactly what the Processors did in violation of the Stipulated Order.

15. Second, the Processors' current position that no order of the Court was necessary to permit them to exceed the 15% cap on reserves from future collections is extraordinary, to say the least. This argument is diametrically opposed to the position they took (and continue to take) in their Emergency Motion and at the December 20 hearing.

16. The Processors currently contend:

> As reflected in the citations highlighted by Pegasus in the Sanctions Motion, the Court merely indicated that it was not in a position to provide a comfort order on that day or decide who is right or who is wrong – the Court did not weigh in on the issue, let alone prohibit Processor from reserving more than 15% in light of Pegasus's refusal to return the $1 million.

Opposition, pp. 3-4.

17. The Processors are correct when they concede that the Court did not enter any order or issue any express ruling at that December 20 hearing that "prohibit[ed] Processor from reserving more than 15%." But the Court did not need to do so; the Stipulated Order already does exactly that. The Processors knew that then and know it now.

18. Indeed, that the Processors were absolutely prohibited from reserving more than 15% of collections – even in the face of the alleged inadvertent transfer of $1 million to Pegasus – is exactly why they filed the Emergency Motion in the first instance.

19. That Emergency Motion expressly sought:

> [an] order compelling Pegasus and Pegasus's lender to return the $1 million to Processor [or] . . . *if Pegasus and Pegasus's lender*

> *fail to comply with this Court's directive, the Court authorize Processor to reserve 100% of the proceeds of Pegasus's credit and debit card sales until Processor achieved the full $1 Million Reserve* (in addition to the Additional Reserve Processor is entitled to build up under the Stipulated Order).

Emergency Motion [Dkt. No. 965-1], p. 4, ¶ 7 (emphasis added).

20. The Processors reiterated this request on the record of the December 20 hearing. Dec. 20 Trans., 21:18-25, 22:25-23:8. In fact, notwithstanding the alleged $1 million under-reserve, the Processors represented to the Court that they "have been living just with – complying with just the fifteen percent reserve [and] haven't felt comfortable taking anything in excess of that." Dec. 20 Trans., 19:24-20:19.

21. But if the Stipulated Order provided the Processors with "explicit authorization" to retain more than 15% of collections (as they now contend, *see* Opposition, p. 4), and there was nothing wrong with their retention of amounts beyond this percentage cap, then why did they not feel "comfortable taking anything in excess of that" 15% and why did they expressly seek the comfort order to allow them to retain more than 15%?

22. And if the Processors were not allowed to reserve more than 15% and, therefore, sought the comfort order, why are they now claiming the Stipulated Order authorized and permitted them to retain more than 15% of collections?

23. These are rhetorical questions, of course, because the fact is that this is all a game. The Processors always knew that they had absolutely no right to withhold more than 15% of collections or to withhold more than $650,000 of collections. Faced with the Motion and the prospects of contempt and sanctions, the Processors have reversed course to avoid the consequences of their misconduct.

24. The Court should not reward the Processors' gamesmanship, and should hold them in contempt.

*The Processors Do Not Dispute That They Provided Conflicting Information in The Various Accounting Records Relating to The Same Period And The Same Category of Information*

25. One of the forms of misconduct identified in the Motion relates to specific contradictory information in two of the Processors' accounting reports. The Motion states:

> [W]hereas when asked by Pegasus, the Processors unequivocally stated that the 100% Holdback was applied to various fees to which they claim they were entitled under the processing agreement, only later to confess that almost $315,000 of this amount was *not* applied to any alleged fees, but was instead being unlawfully "retained" by the Processors for future "potential additional fees that may arise from among other things additional rejected fees, additional 2018 chargebacks, and attorneys' fees[.]"

Motion, p. 3. The Processors provide no response to this charge, as there is no response.

26. In fact, the Processors attempt to lay blame on Pegasus for the Processors' own accounting reports. They contend that "[t]here are multiple reports because with every report provided to Pegasus, counsel would then ask for additional information [and e]ach report covers different time periods and include different categories of information." Opposition, p. 15.

27. This supposed explanation, however, has nothing to do with the specific charge in the Motion, disregarding the fact that the statement is patently false. Since December 2018, Pegasus and the Debtors have been asking for a full accounting for the entire time period for which the Processors were processing credit and debit cards for the Pegasus stores. This was in fact the topic of a court conference on January 7, 2019 when the Processors attempted to limit the amount of information that they were required to provide. When the Court ordered a full accounting, it came in dribs and drabs. The first accounting clearly covers only a limited time period – through November 25, 2018. The second accounting covered the balance of the year, but specifically states that the "Processors are gathering the detailed information for fees and will provide an allocation shortly." The third accounting was a completion of the second, incomplete accounting, which also revealed the misrepresentations in the second.

28. As noted above, the Motion identified a particular and direct contradiction between two of the accounting reports. Contrary to what the Processors would like the Court to believe, those two accounting reports did *not* cover "different time periods," and the issue the Motion raises does *not* relate to "different categories of information." Rather, the contradiction raised addresses reports that cover the *same* time period (November 26, 2018, to January 3, 2019) and relate to the *same* categories of information (the various fees charged by the Processors). Remarkably, the Processors do not even acknowledge the contradiction, let alone even attempt to provide any explanation for it.

### **THE PROCESSORS' CLAIMS OF MISREPRESENTATIONS IN THE MOTION ARE FALSE AND UNSUPPORTED**

29. In an effort to redirect the attention of the Court away from their violative conduct, the Processors assert that the Motion contains "material misrepresentations." This is untrue and moreover not supported by any evidence. A brief discussion of the Processors' contentions follows.

*The Processors' Offer to Tender Funds to Pegasus's Counsel*

30. The Processors disclose that, in advance of filing the Motion, they offered to have "all amounts held by Processor and Swipe in excess of $650,000 to be held by Tippie's law firm in trust pending the Court's ruling on [the Emergency M]otion." Opposition, p. 11, ¶ 19. The Processors attack Pegasus and its counsel for not apprising the Court of that offer and fault Pegasus for not "accepting" that offer.

31. At the outset, to the extent this was a settlement offer and made in the context of the parties' settlement discussions (which it was), Pegasus appropriately did not disclose this information in the Motion. What the Processors do not reveal is that the "offer" to turnover to Pegasus its own money that was improperly withheld by Processors was only made after the

Processors were notified of the intent of Pegasus to file the Motion for sanctions. In any event, the idea that such an "offer" had to be "accepted" to be implemented is inane.

32.     "Acceptance" of that offer and transmittal of the funds to Pegasus's counsel would *not* have disposed of the pending litigation. It was only a temporary transfer of funds pending adjudication of the Emergency Motion. In other words, the Processors did not need Pegasus's permission or consent to transfer improperly withheld funds to Pegasus' counsel; it could have simply transferred those funds and then awaited adjudication of the Emergency Motion. Those funds of course remain in the possession of the Processors.

***Alleged Mischaracterization of The Processors' Counsel's Statements***

33.     The Processors contend that Pegasus "falsely accuses Feld of lying to the Court when he said at a hearing on December 20, 2018 that Processor and Swipe confirm that only 15% of collections had been withheld." Opposition, ¶ 20. First, Pegasus never states that Feld "lied" to the Court.

34.     The Motion is quite clear that the objective of quoting Mr. Feld's statements on the record at the hearing was to demonstrate that, even though Mr. Feld assured the Court on multiple occasions that the Processors were limiting their withholdings to 15% because they did not feel "comfortable" taking more without Court authority, the Processors, in fact, withheld much more than 15% even though the Court did not give them the authority to do so at that hearing (or even now). As the Motion states:

> on no less than four separate occasions at the December 20 hearing, the Court repeated its refusal to enter a 'comfort order' or to otherwise permit the Processors to withhold more than 15% of collections; nevertheless, as discussed below, the Processors blatantly ignored the Court and did it anyway[.]

*The Bliss Declaration*

35. The opposition contends the declaration of Dan Bliss is "inherently misleading." In support of this claim, the Processors point to the fact that Mr. Bliss joined Pegasus "after all the facts that are the subject of the Sanctions Motion occurred" and that he "makes numerous statements during a time period before he was working for Pegasus." There is nothing in the Bliss declaration that is misleading in this regard.

36. The declaration very clearly identifies the relevant dates, including the date Mr. Bliss began his employment at Pegasus, and very clearly states that the information contained in his declaration is based on his review of Pegasus's books and records "as they pertain to its credit and debit card sales and transactions" and other documents. Bliss Declaration, ¶¶ 1-2.

37. Notably, while attempting to discredit Mr. Bliss for lacking personal knowledge of the various credit and debit transactions, in support of their opposition, the Processors then proceed to rely on a table of various figures and calculations of collections that they state Mr. Bliss prepared.

38. Worse yet, while attacking Mr. Bliss's declaration and making many accusations regarding his deposition testimony and calculations, the Processors provide absolutely no declaration or any other evidence to support their representations (not even a copy of the Bliss deposition transcript).

39. In any case, irrespective of the calculations the Processors supply – whatever they are intended to show – the fact remains that the Processors did not comply with the express withholding limits mandated in the Stipulation Order.

*The Processors' Alleged Risk*

40. Lastly, the Processors state that "Pegasus is incorrect to assert that there is no

risk to Processor because the processing relationship has terminated." Opp., ¶ 28. Pegasus never states there is "no risk." Pegasus very clearly *recognizes* that the Processors would still need to handle "fraudulent or unauthorized charges" post-termination of the processing relationship. *See* Bliss Declaration, ¶ 9 ("As a result of termination of the MPA and any of the Processors' obligations thereunder on December 31, 2018, *except* for fraudulent or unauthorized charges, any chargebacks or other returns after that date would not be processed by or through the Processors") (emphasis added). Thus, the Processors' contentions to the contrary are again false.

41.     It is important to note, however, that even as to fraudulent or unauthorized charges, the Processors do not and cannot identify any actual incident of this nature. Instead the Processors rely solely on the "possibility" that there "could have been" some data breach that may cause "potential" damages" – multiple levels of alleged unknown and hypothetical scenarios. This should not be sufficient to justify the need to retain enormous sums of money and withhold amounts from collections not authorized under the Stipulated Order.

[*Remainder of Page Left Intentionally Blank*]

**CONCLUSION**

42. Based on the foregoing, this Court should overrule the Processors' objection, grant the Motion, and award the relief requested therein.

Dated: March 21, 2019
      Wilmington, Delaware

Respectfully submitted,

By: */s/ Christopher M. Samis*

Christopher M. Samis (DE No. 4909)
L. Katherine Good (DE No. 5101)
Aaron H. Stulman (DE No. 5807)
WHITEFORD, TAYLOR & PRESTON LLC
The Renaissance Centre
405 North King Street, Suite 500
Wilmington, Delaware 19801
Telephone:  (302) 353-4144
Facsimile:  (302) 661-7950
Email:  csamis@wtplaw.com
       kgood@wtplaw.com
       astulman@wtplaw.com

*-and-*

Alan G. Tippie (CA No. 89587)
Mark S. Horoupian (CA No. 175373)
**SULMEYER**KUPETZ, A.P.C.
333 South Grand Avenue, Suite 3400
Los Angeles, CA 90071-1406
Telephone:  (213) 626-2311
Facsimile:  (213) 629-4520
Email:  atippie@sulmeyerlaw.com
       mhoroupian@sulmeyerlaw.com

*Counsel for Pegasus Trucking, LLC*